## Taylor Coal Company v. Porter's Administrator.

(Decided May 6, 1915.)

### Appeal from Ohio Circuit Court.

Negligence—Assisting Person in Peril—Attempt at Rescue.—A person who attempts to rescue one who has been put in peril by the negligence of another may maintain a cause of action for injuries sustained in attempting his rescue. But this right of action rests entirely upon the ground that the peril to which the person was exposed was caused by the negligence of the person sought to be made liable, and if the peril was not caused by his

negligence, he is not liable in damages to the person injured in attempting the rescue.

GLENN & SIMMERMAN, LAVEGA CLEMENTS and BEN D. RINGO for appellants.

ERNEST WOODWARD, H. P. TAYLOR and J. M. PORTER for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The Taylor Coal Company, in May, 1913, and prior to that time, was engaged in operating a large coal mine in Ohio County, Kentucky. Some two or three years before this date it had exhausted a coal field containing several hundred acres and had abandoned the mines in this field. While this abandoned field was being operated several air shafts had been sunk at different places about it, but no mention need be made of any of them except the one in which J. E. Porter lost his life.

In May, 1913, the coal company was about to or had opened up a new mine field adjacent to the abandoned one, and for the purpose of draining water from the abandoned field, a ditch was being dug to the air shaft in question, which was situated on the slope of a hill. At the time the accident, to be hereafter described, occurred this ditch had been dug to within probably 50 feet of this air shaft, and from that point to the air shaft it was the purpose to make a tunnel to connect the ditch with the air shaft

J. E. Porter and four other men were engaged in digging in this ditch or tunnel on the day Porter came to his death. On the morning of this day I. P. Barnard, general superintendent of the coal company; John Frazier, general manager; Guy Statler, assistant general manager, and John Veller, mine foreman, were inspecting the premises about where this ditch was being dug. While they were making this inspection they went to the air shaft to which the ditch was being dug, which was about 23 feet deep and 5 feet square. It was walled with timbers from the bottom to the surface of the ground, and across these there had been placed pieces of timber which were used by the men working in this mine before it was abandoned as a ladder. The top of this air shaft, that is, at the surface of the ground, was enclosed by a plank box between three and four feet high, without any cover on the top of it.

While the men named were about this place, Veller went down into this air shaft and was overcome with a poisonous gas known as black damp. Frazier, upon discovering the peril of Veller, went into the shaft to rescue him, and he, too, was overcome. A few minutes after this, J. E. Porter, who, with the other men, had been called from the ditch, went down in this shaft in company with two of these men, and they were overcome by the gas. In brief, five men, in the space of a few minutes, lost their lives in this air shaft.

This suit was brought by the administrator of Porter to recover damages for his death, upon the ground that it was caused by the negligence of the coal company, (a) in failing to fill up or fence the abandoned shaft; (b) in failing to examine it to discover the presence of black damp or other poisonous gases; (c) for its negligence in failing to protect from the danger attending the presence of black damp in this shaft any persons who might be lawfully upon its premises; (d) in ordering Porter to go into the shaft when it knew, or by the exercise of ordinary care could have known, the danger to which he would be exposed, without giving him any warning of the peril.

Upon a trial of the case, there was a verdict and judgment in favor of the administrator of Porter, and the coal company appeals, the principal ground urged for reversal being that the trial court should have directed the jury to return a verdict in its favor. Being of the opinion that this request should have been granted, we will state more in detail the facts and circumstances surrounding this tragedy.

I. P. Barnard, the general superintendent of the Company, lived in Louisville, Ky., and only visited the mine three or four times a year, leaving the active management to subordinate officers and employes. Frazier and Veller were expert, practical miners, each of them holding responsible positions with the company. Barnard, in his testimony, describes what happened as follows:

"Mr. Frazier and myself started from the Williams mine. He came over there to talk over some work with me and asked me to go with him and see where he had located the ditch to drain the water out of the old mine. I told him that I did not think it was necessary; that I would not have time to catch my train. He said he had

a good horse and buggy and was anxious to take me over, and I went with him. When we arrived on top of the hill above where the work had been done, Mr. Statler and Mr. Frazier came up to us. I had not seen Mr. Veller, who was our underground manager, and I stopped and shook hands with him and proceeded down the hill to look at the works. As I said, I did not know anything about this shaft until we came up on it walking down the hill. There was a pathway down the hill, and Mr. Statler was in front of me and Mr. Frazier was next to him and Mr. Veller was behind. Mr. Statler passed on by the shaft. When I came up to it I stopped and looked over into it, and I said, 'Frazier, these timbers are in a good state of preservation,' and he said, 'Yes, the timbers are all right.' I walked on a few steps and Veller came up and looked at it. He remarked, 'I am going down the shaft to see whether the water is falling or rising.' I did not stop walking. I turned my head and said, 'John, there is no use in your doing that.' He said, 'Yes, I want to see whether the water is falling or rising,' and I said, 'You can't do any good by that; come on,' and I walked on. I suppose I had walked maybe 15 or 20 steps from the shaft, and Mr. Frazier was behind me, and Mr. Frazier said to me, 'I heard a splash,' or just spoke out and said, 'I heard a splash,' and he turned and went back and looked over in the shaft. Of course I was watching Frazier, and Frazier slipped off his coat and said, 'Tell the boys that John has fallen into the water in the shaft,' and down he went. I turned and walked up to this shaft and looked over, and by the time I had gotten to the shaft he was down on the lower cross timbers lying on his stomach and he had caught Veller and was holding him out of the water. Two men came up. I saw them go down. I did not see them start down because I was bent over the timbers watching Frazier hold Veller. The two men went down, and as they got to the lower part they went off in the water, and the third man started down. When the third man started down and got pretty well down the shaft, Frazier said, 'I have held as long as I can,' and he turned and went with his head into the water. It was all done in less time than I take to tell it.''

Asked who called the two men who went down after Frazier went down, he said: ''The only thing that I heard said was Frazier said, 'Tell the boys;' I don't

know whether he called to Statler; I know he never spoke to me; he called to Statler, I think, and said, 'Tell the boys John has fallen in the water or in the shaft.' That was the only thing that he said. Or the only thing that I remember of him saying. I don't think I opened my mouth. I have no recollection of it.''

"Q. What did Statler say, if you know? A. I never heard Statler say anything. Q. Where did he go? A. I did not see where he went. Q. Do you know whether or not Statler went down to the ditch where the men were at work? A. I do not. * * * The only thing I did when the last man had fallen, I started to go down the shaft myself. I put my leg over to go down, and there was a negro man came up and laid his hand on my shoulder and said, 'Boss, don't go down there; you can't do any good.' I did not know any of the men from the ditch who went down, nor did I know that there were any men working in the ditch. I did not know anything about the black damp in the shaft.''

Statler, putting his evidence in narrative form, said that he knew there were some men working in the ditch. That he did not remember hearing Veller say that he was going down in the shaft, and did not see him go down; that he heard Frazier say he heard a splash. ''He made that statement, that he heard a splash. Not to any person; just merely in a general way. He had passed this shaft some 3 or 4 feet and when he ran back after saying that he heard a splash and glanced over inside, he immediately pulled his coat off and hollered to me, 'Guy, John is in the water; call the boys.' I knew he meant the boys in the ditch, and immediately, as fast as I could, I ran down to where I thought I could make them hear and shouted possibly three times, and said, 'Say, boys, John is in the shaft.' Some one, I do not know which one, stuck his head out from under the projecting coal left there digging the tunnel. After seeing one of those boys show himself, I directed my attention then to going back towards the shaft. These boys followed me up towards the shaft, and they came out I should say 5 or 6 feet from the entrance to this tunnel. And they ran as hard as they could go, and when I got nearly up to the shaft I turned to get a cross-cut saw lying near. It had a handle on each end, and by the time I did that there was, as I thought, two men in the shaft. I saw Porter climbing in before I got up to the

shaft some ten or fifteen feet, and it seems he was the last man, and the men in front of him I did not see go in. In fact, I did not know how many men were in there. When I got to the shaft the men were all down in the water, and Mr. Barnard asked me what I was going to do with the saw, and I said I hoped to be of some assistance by handing it down to some of the boys, and he said, 'You can't do any good,' and I said, 'My God, Mr. Barnard, what can we do?' And he told me to run to the mines after men and rope, and I ran as he told me. I went down to the ditch where the men were for the purpose of telling them that John was in the water. I went to get assistance, and they came as quickly as they understood what I wanted. * * * I did not know at the time Porter went up there that he would be in any danger. I did not suspect it. All I did was to report to Porter, and these other men that John Veller was in the shaft.''

Joe Berry, one of the men who was working in the ditch with Porter, said he heard Mr. Statler say, ''Mr. Veller's in the old shaft up there.'' He said, ''Mr. Veller is in the old shaft.'' ''That is all he said, 'Come out, John Veller is in the old shaft.' He called me out after he called them.''

These are the only witnesses who testified as to what occurred at the time, and there is little, if any, contradiction in their evidence. Restating it briefly, it appears that Veller, an experienced miner, voluntarily and indeed over the objection of Barnard, went down in this shaft and was overcome with black damp; that Frazier, also an experienced miner, after exclaiming, ''Guy, tell the boys that John Veller is in the shaft,'' went down, and he, too, was overcome; that Statler, upon hearing what Frazier said, immediately went to the nearby ditch, where Porter and the other men were working, and called to them several times, ''Say, boys, John is in the shaft,'' and thereupon Porter and the other men went as fast as they could from the ditch to the shaft and lost their lives in an effort to rescue Frazier and Veller, as Frazier had lost his life in an effort to save Veller.

That this air shaft was full of deadly gases is, of course, apparent, but it is equally clear, we think, that Veller did not know it, or else, experienced miner as he was, he would not have gone into it when there was no necessity for going or direction to do so. It is prob-

able that Frazier, when he saw Veller struggling in the bottom of the shaft, knew what had happened, as he was an experienced miner. Whether the other three men who lost their lives knew or appreciated the danger, is not known.

There is some claim by counsel for appellee that the coal company was guilty of negligence in not having this air shaft filled up or so covered as to prevent access to it; but we do not find any substance in this argument. At the time this accident happened there was no statute law or other law in force in this State requiring the filling up or enclosing in any manner of air shafts in abandoned mines. Section 4359 of the Kentucky Statutes, providing that "wells and pits sunk for salt water, or any other purpose, when they shall be abandoned or not used, shall be filled up or enclosed," applies only to salt or saltpetre works, as is shown by its title as well as by its body. But, aside from this, this shaft was sufficiently enclosed to protect it and prevent persons from falling into it. It is, therefore, plain that the coal company was not guilty of any negligence in failing to have this air shaft filled up or more securely enclosed.

If there had been no enclosure about it, this condition could not in any manner affect the question involved in this case, because the persons who lost their lives purposely went into the shaft.

The argument is further made that the coal company knew, or by the exercise of ordinary care could have known, that black damp had accumulated in this shaft, and, therefore, it was under a duty to remove this deadly agency or to so protect or enclose the premises as that no person could be injured in consequence thereof.

It may be assumed, so far as this case is concerned, that the company knew, or in the exercise of ordinary care could have known, that black damp had accumulated in this shaft; but this knowledge does not show it to be guilty of any negligence so far as this transaction is concerned, as it conclusively appears that the company could not have anticipated that the accident in which Porter lost his life would have happened in the manner it did. It was, in fact, that character of accident that no amount of care short of filling up or cleaning the shaft could have guarded against, and the company, so far as the facts of this case are concerned, was under no duty to do either.

It is also urged that Porter was directed or ordered by employes of the company superior in authority to him to go into this shaft, but the evidence does not sustain this contention. When Frazier discovered Veller in the shaft, he told Statler to tell the boys that Veller was in the water or in the shaft, and Statler, in substance, repeated to Porter and the other men what Frazier had told him. This exclamation or information was not, however, an order or direction to any of them to attempt to rescue Frazier or Veller. When this notice was given to Porter, who was some distance from the shaft, it merely conveyed to him the notice that Veller was in the shaft. He was not ordered or directed to go to the shaft, and when he went to it, not a word was said to him about going in. His action in going into the shaft was entirely voluntary and was prompted by his brave and generous impulse to save the life of the men he believed were in peril.

It may, however, be well assumed that when Frazier gave the information mentioned to Statler, and Statler conveyed it to Porter and the other men, that both Frazier and Statler knew what these men would do. That they expected them to come at once and render all the assistance possible and do everything that could be done to rescue Veller.

If, however, what was said by Statler to Porter and the men in the ditch should be construed into a request or direction or command to go at once to the shaft and endeavor to save Veller, it would not fix liability on the company for the accident, because it was not guilty of any negligence. It is well settled that a person who attempts to rescue one who has been put in peril by the negligence of another may maintain a cause of action for injuries sustained in attempting his rescue. But this right of action rests entirely upon the ground that the peril to which the person was exposed was caused by the negligence of the person sought to be made liable. Sherman & Redfield on Negligence, Vol. 1, Sec. 85; Lemay v. Springfield St. Ry. Co., 210 Mass., 63, 37 L. R. A. (N. S.), 43, and cases cited in note; Norris v. Atlantic Coast Line Ry Co., 152 N. C., 505, 27 L. R. A. (N. S.), 1069.

So that if Frazier, in place of speaking to Statler, had himself called to the men in the ditch and told them that ''Veller was in the shaft, come to his assistance,'' no legal liability would attach to the company.

No person who is free from negligence himself can be made liable in damages on account of injuries sustained by a person who, at his request, comes to the assistance of one who is in danger or exposed to peril. There is scarcely a day passes that brave men, in response to requests for assistance, do not expose themselves to danger and death in efforts to rescue persons in peril, and yet no one would think of holding that the person who called on them for assistance would be liable for any accident that might happen to them in their efforts at rescue unless the person sought to be made liable had, by his own negligence, produced the peril.

If a man standing near a burning building, owned by himself or some one else, should call on those present to rescue from the flames some person in the burning house, no one would think of holding him liable if those who attempted the rescue sustained injury or lost their lives in the effort. And so, if one who saw a person struggling in the water should call for assistance, and a bystander, in response to the call, should lose his life in an effort to save the drowning person, no one would think of saying that the person who made the request might be made liable in damages for his death.

There is no difference between the supposed cases and the one we have. We repeat, neither the coal company nor any person connected with this unfortunate transaction was guilty of any negligence unless it should be that Veller's act, in going into a shaft that he might have known was dangerous, was negligence. If so, he paid the penalty with his death.

The judgment is reversed, and the case remanded for a new trial, and if there should be another trial and the evidence is, in substance, the same as appears in this record, the court will instruct the jury to find a verdict for the defendant.