There was evidence on the part of plaintiff which tended to show that on the night of 4 June, 1906, plaintiff, with a comrade, one J.H. Stewart, left the village of Benson, a station on defendant's road, and were walking along the track towards Dunn; that they left Benson about 10:30 p.m., just after the regular train had passed, and at a point about 2 3/4 miles from Benson, Stewart said, "Let's rest," and sat down on a cross-tie with his head a little dropped; that while Stewart was so placed, and plaintiff was standing across the track near the ties, an engine and tender of defendant company approached, the tender being in front as it was moving; that the engine was off schedule, going down the road to relieve a passenger train, which had been disabled and was waiting on the track some distance away; it had a lantern in front of the tender, which gave light, throwing a light on the track for 10 or 15 feet in front as it was moving; that there were several public crossings back of them, one of them a very much used crossing about 250 yards away and another 245 yards ahead; there were also two whistle-posts near, the point being in vicinity of Mingo, another station on the road; that when plaintiff realized it was a train, he called to Stewart, and then jumped across the track to pull him off, and, in the effort to save him, they were struck by the engine and Stewart was killed and plaintiff badly injured; that it was a thickly settled community where people were much accustomed to use the track, and the engine approached running very rapidly and without giving any signals.
Plaintiff testified that he saw the light on the tender in time to have saved Stewart, but did not realize it was a train till he called.
There was a signed statement by plaintiff, introduced by defendant, which had been made shortly after the occurrence, and tending, in some respects, to contradict his statement.
Some of the evidence pertinent to the issues is set out in the record as follows: Plaintiff testified:
"I and J. H. Stewart were coming from Benson on 4 June, 1906. We left Benson about 10:30 at night and traveled 3 or 3 1/2 miles. We left after the shoofly and traveled on the railroad. Stewart sat down and said, `Let's rest.' We had passed several crossings. Stewart sat down near a footpath, on the right side, on the end of a cross-tie, with his head a little dropped. I was standing on the east side of the track, at the end of the cross-tie. I saw a light and heard a train. Stewart did not notice it, and I jumped and caught him, and the train knocked me loose. I thought it was a box car in front, or an engine and (508) tender running backwards. The light showed to be like a lantern; it threw a light 10 or 15 feet in front. I could see the light a good *Page 486 
ways off; it was dim. I saw the light far enough off to have saved Stewart and myself, but did not know it was a train, and heard no bell or whistle. The train made very little noise and was running very fast. Everybody travels the railroad, night and day. It is a thickly settled community. All use it as a public footpath. There is a crossing 250 yards back toward Benson, and in front about 245 yards. We were 180 steps from a whistle-post. Cannot tell what happened for a short time after I was struck; part of the time I was sensible and part of the time not."
"I had taken one drink. I saw Stewart take one drink. He appeared sober. I had a pint of whiskey with me; took one drink on the way. It took us 40 or 45 minutes to go from Benson to the place where I was hurt. When I saw the light and heard the train, I was standing near the end of the ties. I called to Stewart; he did not notice me, and I jumped across to pull him off. I do not know whether or not the train struck Stewart. I was under the influence of drug when I signed paper for W. H. Pope. I get about same wages I did before."
Jesse McLamb, witness for plaintiff, testified as follows:
"I live between Dunn and Benson. I was going home from McLamb's; had been taking some bee-gums. The shoofly passed, and we started home. I was in some 50 yards of home and heard the roar of the train; it was going backwards; had a glimmer of light. I heard no whistle or bell. As I got home a clock struck 11. The train was going mighty fast — as fast as I ever saw one run. There is a public crossing before you get to the trestle, another after you pass, and at my house still another. Stewart's body was 200 or 300 yards from crossing at my house. Went to see Norris in two or three weeks; he was in bed and seemed to be suffering. People walk the railroad more than the county road. The community is thickly settled; has been so used ever since built, thirty years or more. There is a great deal of foot travel along this part of the track, both day and night."
W. L. Stewart testified:
"Got to railroad and saw glimmering light; it was very little, and I took it to be a switch light. Almost by the time I got off the track the train passed; no whistle or bell. It looked like an engine and tender running backwards, and was running very fast. The railroad is traveled a great deal, day and night, by pedestrians. Saw Norris (509) next morning; did not appear to know anything. He was suffering; he was feeble a long time. There are two whistle-posts near the place the injury occurred. The nearest crossing is 200 or 300 yards towards Benson and is used a great deal by the public."
Nazro Stewart, witness for plaintiff, gave substantially the same testimony as W. L. Stewart, and said he "saw a dim light that looked about *Page 487 
like a star; that train consisted of an engine, running backwards, with tender in front; no whistle or bell sounded; train making very little noise, and was running very fast. We hardly had time to clear the track before it passed. This part of track is used a great deal by the public as a footway."
J. A. Stewart, witness for plaintiff, testified:
"There has been a crossing near this place since I can remember. Railroad is used as a footpath; thickly populated community, and the railroad is used as a footway a great deal, both day and night."
A. W. Stewart, witness for plaintiff, testified:
"I was sitting on my piazza, 150 yards from railroad, about 11 o'clock at night. Engine and tender passed, running backwards; it had a little light in front; was running very fast; heard no signals. The train was running as fast as I ever saw one."
Among other witnesses for defendant, Captain Bullock testified:
"I was engineer on engine and tender; was running as a second section of 31, and 20 minutes behind it at Benson. Shoofly left Benson at about 11:15. We were running 20 miles an hour. Six trains passed this point that night. I saw no one. We had a headlight on rear and lantern on tender, running backward. I tried to ring bell at all crossings and blow whistle; cannot say positively as to this one. It was equipped as engines usually are when running backward. I was going to Wade, N.C. to the relief of a through passenger train which was disabled and waiting."
And Captain Howie, witness for defendant, testified:
"I was conductor on this train. We did not make schedule on account of running backward. (Testimony as to equipment same as witness Bullock.) We were going to Wade, N.C. to the relief of a through passenger train which was disabled and waiting. I told Captain Goodrich, the section master, that we came near striking some people that night, as I saw some persons right close to the track. We were running fast, but cannot say how many miles per hour; cannot say as to whether signals were given for crossings."
The jury rendered the following verdict:
"1. Was the plaintiff injured by the negligence of the defendant? (510) Answer: Yes.
"2. Did the plaintiff, by his own negligence, contribute to his own injury? Answer: No.
"3. What damage is the plaintiff entitled to recover? Answer: $1,500."
Judgment for plaintiff, and defendant excepted and appealed, assigning for error the refusal of the court to dismiss as on judgment of nonsuit. *Page 488 
It has been repeatedly held with us that where a person is traveling along a highway, so close to a railroad track and in such a position that the approach of a train should be adverted to, in the exercise of reasonable care for his own safety, or where a person is on the track, at a place where travelers are habitually accustomed to use the same for a walkway, they have a right to rely, to some extent and under some conditions, upon the signals and warnings to be given by trains at public crossings and other points where such signals are usually and ordinarily required, and that a failure on the part of the company's agents and employees operating its train to give proper signals at such points is ordinarily evidence of negligence; and where such failure is the proximate cause of an injury it is, under some circumstances, evidence from which actionable negligence may be inferred.
An instance of the first proposition will be found in the case ofRandall v. R. R., 104 N.C. 410, where plaintiff was driving an ox team at a point very near the track, importing menace to the safety of the team, and where an injury in fact resulted, and testified that he would not have driven the team into the dangerous place if he had been properly and adequately warned by the signal whistle at the station or crossing some distance ahead. In that case, as relevant to the question presented, the facts and the legal principle applicable are summarized and stated byAssociate Justice Avery, delivering the opinion, as follows:
"The train passed at an unusual hour along a narrow canyon, where the wagon road ran, at some points, close beside defendant's track, and, at others, diverged a little distance from it.
The plaintiff had passed the station and then gone over a crossing, near which the wagon road, for a very short distance, was located in the narrow space between the mountain and the track, when he heard (511) a slight blow from the engine, and, almost immediately, it passed around a curve on the mountain, only 60 or 70 yards ahead of him, and the noise and blazing headlight so frightened the oxen that, in attempting to get out of the way, three of them jumped upon the track and were killed. This occurred less than six months before the action was brought.
"The plaintiff further testified that, if the regular station blow, or the crossing blow, had been given at the usual point, he could have stopped his oxen behind a large pile of wood before he reached the narrow place, and could have saved them, but that because the blow was not given, he had advanced to the place where on the one side was the *Page 489 
steep mountain and on the other the track of the railroad company. The engineer testified that he blew the station blow, and as loud as usual, and at the usual place. On the decision of the issue of fact thus raised the whole controversy depends. Troy v. R.R., 99 N.C. 298.
"When a person in charge of a wagon and team approaches a public crossing it is his duty to look and listen and take every prudent precaution to avoid a collision, even though the approach be made at an hour when no regular train is expected to pass. The same degree of care and caution should be exercised by one who is about to drive into such a narrow and dangerous pass as is described by the witnesses, if he would avoid the responsibility for any injury that may result from his carelessness. But it is the duty of the engineer to blow the whistle or ring the bell at a reasonable distance from such a crossing as was described by the witnesses, in order to give warning to travelers on the ordinary highway running across and near it, and enable them to guard against danger. It is always required of an engineer, if he would relieve the company from liability for negligence, to blow the whistle, as a warning, at a reasonable distance from the crossing of a public highway, or a station, which his train is approaching, and is doubly important where the track winds around curves, between a mountain and river, by the side of a public road; and, if travelers on such highway are subjected to loss by injury to their live stock at a crossing or narrow pass like that described by the witnesses, in consequence of his failure to give such warning as they had a right to expect, the company is liable in damages for such negligence. 2 Wood R. L., 323; Kelly v. R. R., 29 Minn. 1; R. R. v. Garty, 79 Ky. 442; Penn. Co. v.Krick, 47 Ind. 368; R. R. v. Jundt, 3 Am. Eng. R. Cases, 502; Strong v.R. R., 61 Cal. 326; Hoar v. R. R., 47 Mich. 401; Troy v. R. R., supra."
And the second position suggested is sustained in the (512) well-considered opinion of Mr. Justice Walker, in Morrow v. R.R., 147 N.C. 623, in which it was held:
"1. The failure of the employees of a railroad company to give crossing signals at a public crossing does not constitute negligence per se, when the injury complained of occurred to a pedestrian while using. the track at a different place, but is only evidence of negligence under certain conditions."
And delivering the opinion, Judge Walker said:
"But the fact that no such warning was given, while not negligence perse as to the pedestrian using the track for his own convenience, may be evidence of negligence as to him in the operation of the train, when it is run in the night-time without a headlight, and prudence requires a warning to be given. There was evidence in this case that the plaintiff, when he was injured, was where people in the vicinity were accustomed *Page 490 
to walk, and under the circumstances he was entitled to notice of the approach of the train, if there was no headlight and it was so dark that he could not see it in time to leave the track."
And the general principle has been frequently upheld in other cases.Hinkle v. R. R., 109 N.C. 472; Troy v. R. R., 99 N.C. 298.
Applying, then, the doctrine as it obtains with us, we are clearly of opinion that it was a negligent act to run an engine and tender backwards in the night-time at a very high rate of speed, through a thickly settled community where large numbers of people were habitually accustomed to use the track for a walkway, giving no signals or other warnings at public crossings, and with just a lantern in front of the tender as it was moving, throwing light along the track for a distance of only 10 or 15 feet. It was conduct that was more than likely to result in a collision, and, when it was shown as a result of such conduct that a person sitting on the track has been hurt, we think that actionable negligence against the company could very well be inferred.
It was suggested that the evidence showed that there was a sufficient light in front of the tender, because the plaintiff himself testified "that he saw the light a good ways off, and far enough to have saved Stewart"; but it is no fair deduction from this excerpt that the witness intended to say that the light was adequate or at all sufficient to warn him that an engine was approaching, or that an injury was likely; on the contrary, and by correct inference, a perusal of the testimony of the witness justifies the interpretation that he saw the light some distance off, but that no signals or warnings having been given, and very (513) little noise having been made by the single engine and tender, the witness did not realize, and had no good reason to suppose, it was a train importing serious danger, until it was very near; and, as soon as he did realize this, he called to his comrade and then jumped to save him. Here is the entire statement of the witness relevant to this suggestion:
"Stewart sat down and said, `Let's rest.' We had passed several crossings. Stewart sat down near a footpath on the right side, on the end of a cross-tie, with his head a little dropped. I was standing on the east side of the track, at the end of the cross-tie. I saw a light and heard the train. Stewart did not notice it, and I jumped and caught him, and the train knocked me loose. I thought it was a box car in front, or an engine and tender running backwards. The light showed to be like a lantern; it threw a light 10 or 15 feet in front. I could see the light a good ways off; it was dim. I saw the light far enough off to have saved Stewart and myself, but did not know it was a train, and heart no bell or whistle. The train made very little noise and was running very fast." And on cross-examination: "When I saw the *Page 491 
light and heard the train, I was standing near the end of the ties. I called to Stewart; he did not notice me, and I jumped across to pull him off."
There is no claim on the part of the defendant that the usual signals were given on this occasion; Captain Bullock, the engineer, testifying for defendant in reference to this question, said: "I tried to ring bell at all crossings and blow whistle; cannot say positively as to this one."
And Captain Howie, the conductor, said: "We were running fast, but I cannot say how many miles per hour; cannot say as to whether signals were given for crossings."
And, under the authorities heretofore cited, and others of like kind, we think that this failure to give the usual signals, with the absence of sufficient light to afford anything like adequate notice of the approach of the engine, in connection with the other facts heretofore stated, resulting in the killing of one man and the serious injury of another, made a case from which the jury were well warranted in rendering a verdict against defendant on the first issue.
This being true, it is well established that when the life of a human being is suddenly subjected to imminent peril through another's negligence, either a comrade or a bystander may attempt to save it, and his conduct is not subjected to the same exacting rules which obtain under ordinary conditions; nor should contributory negligence on the part of the imperiled person be allowed, as a rule, to affect the question. It is always required in order to establish responsibility on the part of defendant, that the company should have been in fault, but, (514) when this is established, the issue is then between the claimant and the company; and when one sees his fellow-man in such peril he is not required to pause and calculate as to court decisions, nor recall the last statute as to the burden of proof, but he is allowed to follow the promptings of a generous nature and extend the help which the occasion requires; and his efforts will not be imputed to him for wrong, according to some of the decisions, unless his conduct is rash to the degree of reckless; and all of them hold that full allowance must be made for the emergency presented.
This principle is declared and sustained in many well-considered and authoritative decisions of the courts and by approved text-writers, and prevails without exception, so far as we have examined. Eckert v. R.R.,43 N. Y., 502; Corbin v. Philadelphia, 195 Pa. St., 461; Steele Co. v.Marriers, 88 Md. 482; Pa. Co. v. Langendorf, 48 Ohio State, 316; R. R. v.Ridley, 114 Tenn. 727; Taylor v. Parsons, 122 Iowa 679; Henry v. R. R., 67 Fed., 426; Shearman Redfield (5 Ed.), sec. 85. *Page 492 
In Eckert's case, supra, it was said:
"The law has so high a regard for human life that it will not impute negligence in an effort to preserve it, unless made under circumstances constituting rashness in the judgment of prudent persons."
In Pa. Co. v. Langendorf, supra, it was held:
"1. It is not negligence per se for one to voluntarily risk his own safety or life in attempting to rescue another from impending danger. The question whether one so acting should be charged with contributory negligence in an action brought by him to recover damages for injuries received in attempting the rescue, is one of mixed law and fact, and should be submitted to the jury upon the evidence, with proper instructions from the court.
"2. While one who rashly and unnecessarily exposes himself to danger cannot recover damages for injuries thus brought on himself, yet, where another is in great and imminent danger, one who attempts a rescue may be warranted by surrounding circumstances in exposing his limbs or life to a very high degree of danger; and in such cases he should not be charged with the consequences of errors of judgment resulting from the excitement and confusion of the moment."
In R. R. v. Ridley, supra, the same doctrine is thus stated:
"2. It is not only lawful, but a laudable act, to attempt to (515) save human life when it is imperiled by great danger, and in a sudden emergency, and in such cases the courts will not require the intending rescuer to stop, hesitate, and weigh probabilities until it is too late to make the rescue, but it is sufficient if he acts with such care as a reasonably prudent and careful person would use in such emergencies and under similar environments.
"3. Where a person, acting in a sudden emergency and using such care as a reasonably prudent and careful person would use in such emergencies and under similar environments, loses his life in attempting to save the life of another in imminent danger from the wrongful, careless, and negligent act or conduct of the defendant, he is not guilty of such contributory negligence as will bar a recovery for his wrongful death."
In Shearman and Redfield, sec. 85, the author well says:
"The plaintiff's right to recover is not affected by his having contributed to his injury, unless he is in fault in so doing. It is possible for the plaintiff not only to contribute to his own injury, but even to be himself its immediate cause, and yet to recover compensation therefor. Thus, he has a right to assume some risk of personal injury, when necessary to escape a greater risk. So, one who, seeing his property imperiled, hastens to protect it, and in doing so imperils his own person, is not necessarily deprived of his remedy thereby. It is his right and *Page 493 
duty to protect his own property, so long as he can do so without recklessly exposing himself to injury. One who imperils his own life for the sake of rescuing another from imminent danger is not chargeable, as matter of law, with contributory negligence; and, if the life of the rescued person was endangered by the defendant's negligence, the rescuer may recover for the injuries which he suffered from the defendant is consequence of his intervention. There need be no fear that this principle will make any one liable for the cost of volunteered benevolence, without being himself in fault. No one is liable at all, unless he is in fault."
Applying this principle to the facts presented, there was certainly no error to defendant's prejudice in submitting the question of contributory negligence on part of plaintiff to the jury, and the learned judge correctly held that, on the entire evidence, defendant's motion to nonsuit should be denied.
The authorities cited and relied on by the defendant are chiefly cases involving the proposition as to when and under what circumstances the employees of a railroad are required to stop its train in order to avoid a collision, and have no application here; for no such requirement was imposed on the company. In the present case responsibility on the first issue has been fixed on defendant, because of a breach of duty, on the part of its agents and employees, in running an engine backwards (516) in the night-time, through a thickly settled community, at a high rate of speed, without any signals given at the usual places, and without adequate lights to warn one of its approach. There is
No error.
Cited: Exum v. R. R., 154 N.C. 418; McKay v. R. R., 160 N.C. 262; Barnesv. R. R., 168 N.C. 514; Brown v. R. R., 172 N.C. 606.