## EVERETT A. MINTZ v. TOWN OF MURPHY.

(Filed 26 March, 1952.)

**1. Negligence § 1—**

Actionable negligence is the failure to exercise proper care in the performance of some legal duty which the defendant owes plaintiff under the circumstances, which proximately causes injury to plaintiff.

**2. Negligence § 5—**

Proximate cause is that cause which produces the result in continuous sequence and from which a man of ordinary prudence could have foreseen that such result was probable under the facts as they existed.

**3. Negligence § 19a—**

Negligence is a question of law, and when the facts are admitted or established the court may say whether there has been a negligent breach of duty and also whether it was a proximate cause.

**4. Negligence § 19b (1)—**

Nonsuit is proper in an action for negligence when all the evidence taken in the light most favorable to plaintiff fails to show any one of the elements of actionable negligence.

**5. Negligence § 19d—**

Nonsuit is proper in a negligence action when it clearly appears from the evidence that the injury complained of was independently and proximately produced by the wrongful act, neglect, or default of an outside agency or responsible third person.

**6. Municipal Corporations § 12—**

In supplying electricity for private advantage and emolument a municipality is regarded as a private corporation and is liable for actionable negligence of its servants, agents and employees.

**7. Electricity § 6—**

An electric company is held to the standard of care of an ordinarily prudent person under the circumstances, which, in regard to wires carrying a strong and lethal current, is the duty to exercise the utmost care and prudence consistent with the practical operation of the business.

**8. Same—**

An electric company is not required to maintain insulation on wires at places where it cannot be contemplated that any person could come in contact with them.

**9. Electricity § 11—Evidence held to show that injury resulted from independent act of responsible third party, and nonsuit was proper.**

The evidence tended to show that in the construction of a highway it became necessary for defendant municipality to move its poles, that the municipality was co-operating with the Highway Commission to this end, but that before the question of right of way had been settled, plaintiff's employer began work in the construction of a culvert, and that in the progress of the work plaintiff was injured by an electric shock when current from defendant's uninsulated wires jumped a gap of some twelve inches to the beam of the derrick in connection with which plaintiff was working. *Held:* The evidence discloses that the injury resulted from the independent intervening act of those in control of and operating the derrick, over which defendant had no control, and nonsuit was properly entered.

Appeal by plaintiff from *Rudisill, J.,* November Term, 1951, of Cherokee.

Civil action to recover damages for personal injury allegedly resulting from actionable negligence of defendant.

From the case on appeal it appears to be uncontroverted that plaintiff was injured on forenoon of 11 September, 1948, by electric shock while working as an employee of T. F. Houser, in pouring concrete in constructing a culvert at Haney Branch on State Highway No. 64, Project 9171, in Cherokee County, North Carolina, under an electric transmission line of defendant Town of Murphy.

The acts of negligence with which plaintiff charges defendant as proximate causes of his injury as alleged in the complaint, and as summarily stated, are: (1) Defective construction of its transmission line,—poles and cross-arms of wood too small to carry high tension wires, and failure to insulate wires; (2) failure to maintain its transmissions line,—thereby permitting poles to decay, and wires to sag, thereby creating hazard to those it might expect to work in close proximity thereto; (3) failure to remove the line when ordered by State Highway and Public Works Commission, or to cut off the current, having knowledge of conditions surrounding the work being done at the Haney Branch culvert; and (4) failure to give notice of existent danger.

Defendant, answering, denies all allegations of negligence on its part, and pleads as further defenses, summarily stated, among other things, intervening negligence of T. F. Houser, his agents and servants, as the sole proximate cause of plaintiff's injury.

Upon the trial in Superior Court plaintiff offered evidence tending to show the following:

The State Highway and Public Works Commission of North Carolina had previously, to wit 28 July, 1948, awarded a contract to Asheville Contracting Company, as independent contractor, "to repair, alter, change, relocate and rebuild" certain portions of Highway No. 64 from

its junction with Highway No. 60 at or near Ranger northerly to the Town of Murphy, all in Cherokee County and known as Project No. 9171, in accordance with standard rules and specifications for roads and structures, of date 1 January, 1946. (Contract and specifications were not introduced in evidence).

The Asheville Contracting Company sublet to T. F. Houser, or Houser Construction Company, as sometimes referred to, contract to construct culverts on this project 9171. Paul Cook was foreman for T. F. Houser, and plaintiff was employed by T. F. Houser on this job.

The Town of Murphy, a municipal corporation, owning an electric distribution system through which it distributes electric current for pay to customers within and outside its corporate limits,—the current being purchased by it from Tennessee Valley Authority at wholesale price, maintained a part of its distribution system along Highway 64 over and beyond Haney Branch on State Highway Project 9171. And E. G. Hughes was the manager of the electric department of the Town of Murphy with authority to supervise the maintenance of the transmission lines, to purchase material, etc.

T. B. Wilson was principal right of way engineer of the State Highway and Public Works Commission, and F. L. Hutchinson was its resident engineer on Project 9171.

And under the contract between State Highway and Public Works Commission and Asheville Contracting Company it was "the business and obligation" of the Commission, and not of the contractor, to have obstructions, like electric transmission lines or poles, removed from the right of way where Project 9171 was to be located or constructed.

And on 14 August, 1948, T. B. Wilson, in official capacity, wrote a letter to E. G. Hughes, of the electric department of the Town of Murphy, on the subject of "Pole Conflict—Town of Murphy" on Project 9171, as follows:

"I am advised by our Mr. Snelson that it will be necessary to move approximately 39 poles which conflict with the construction of the above project and investigation of the status of right of way for these poles indicates that the line was originally erected by the Southern States Power Company in 1932 or 1933, and that a right of way was secured and recorded for this line. However, we find that the poles were not placed on private right of way, but were erected on the public right of way of the highway; therefore, it would appear that the cost of relocation of these poles should be borne by the town.

"Mr. Snelson advised that due to some minor changes in alignment of this project that it is possible the number of poles which are to be moved may vary somewhat from the number given above, and I would suggest that you keep in touch with the Resident Engineer or Mr. Snelson, so that some of the poles may not be unnecessarily moved.

"It is requested that you please arrange to move these poles as soon as possible, as the contract for the construction of this project has been awarded."

Thereafter on 25 August, 1948, Hughes, as such manager, replied thereto by letter, which Wilson received 28 August, 1948. This letter reads as follows:

"I contacted Mr. F. L. Hutchinson, after receiving your letter dated August 14, 1948 on above subject. We went over the project with Mr. Hutchinson's maps and he feels that we will be able to re-locate on State Highway right of way, between the highway and railroad without conflict to either, if it will be agreeable with your Commission. He states that I should contact you with reference to Contract Forms and that you could probably furnish same.

"I will have to re-locate within the next forty-five days to not conflict with the progress of your contractor. Will you please advise me the proper procedure, so that I may make immediate steps as it will take some time for a survey and re-locating line.

"Thanking you for your immediate attention."

Wilson testified: "It wasn't determined at the time how many poles it was necessary to remove, the number given in the letter was just approximate. . . . There were negotiations going on between the Town of Murphy and the State Highway Commission for the Town of Murphy to remove this electrical line. Mr. Hughes or the town was co-operating with the resident engineer, Mr. Hutchinson, about clearing the right of way and removing the poles. I would qualify that statement 'from the correspondence we had they were doing all they could' . . . I do not know of my own knowledge just what the Town of Murphy and Mr. Hughes did in regard to this line. I transferred that to our resident engineer . . ."

And in this respect, Hutchinson, on cross-examination, after testifying that he received copy of letter from Wilson to Hughes, said: "After I received that letter, Mr. E. G. Hughes, an employee of the Town of Murphy, contacted me and discussed with me the question of a removal of the transmission line that was maintained by the Town of Murphy. In my conversation with Mr. Hughes . . . it was discussed that it would take possibly some 2 or 3, some few weeks or days due to the fact that before the town could remove its transmission line and replace it, that they had to acquire a right of way upon which to place it. There was also a question undetermined as to just how many poles that it was necessary to remove. . . . It was necessary that the town acquire poles on which to place the transmission line when it was moved . . . Mr. Hughes . . . went out with me over the project to determine the poles to be removed and Mr. Hughes and his crew started work in the area of Haney Branch . . . dug several holes in that area and I believe . . .

set several poles, and I asked him why he didn't continue with his locating, and he said he could not continue to set the poles until he could get a right of way for the new location. The plaintiff was injured during the period of time that Mr. Hughes or the Town of Murphy was endeavoring to remove its transmission line. . . . At the time I received the letter copy dated August 14, 1948, from Mr. Wilson, we knew that the poles at Haney Branch should be removed. We knew they had to be removed, prior to the injury of Mr. Mintz. . . . They would only have to have moved two poles, one on the east side and the one on the west side of Haney Branch culvert to have moved the line away from the crane being operated . . . From what I have observed and what I believe I do know it would be more efficient operation with good operating practice for the operator of an electrical distribution line similar to the distribution line maintained by the town of Murphy to move the whole system than it would be to just move a portion of the system. On the morning that plaintiff was injured I looked over the culvert at Haney Branch. I was there afterwards and observed the location of the poles, etc. . . ."

And this witness further testified: "Mr. Houser had been working and pouring concrete culverts on the far west end of the project . . . doing work where the Town of Murphy didn't have its electric line."

And Paul Cook, foreman on this job for T. F. Houser, testified: "In connection with building the culverts on Highway 64, Project 9171, we began this project sometime about August 12th, 1948, west of the Haney Branch. We had some shovel work and labor to do before we moved to the Haney Branch structure. We moved to this place September 9th. Mr. Hutchinson . . . submitted to me the plans and specifications for the work . . . I do not know E. G. Hughes or any of the governing officials of the town of Murphy. Neither Mr. Hughes or any of the officials . . . gave me instructions as to any of the switches. I can't recall that I saw Mr. E. G. Hughes on the operation before the accident but did see him after that. The power line was on the poles. I didn't see any posters or publications or warnings attached to or about the power line anywhere . . ."

And in this connection, witness, Thomas West, testified: "I recall the time about September 11, 1948, when Everett Mintz was injured . . . about that time or immediately preceding it I was there clearing the right of way for the new highway location . . . I saw Mr. E. G. Hughes down there during the operation as the work progressed. When we started to cut the right of way through that Haney Branch section, where there was a deep cut, the wires were in the way and I saw Mr. Hughes about moving the wires from that section and he said that he could not get to it at that particular time but made a date when he talked to me

later, that he would cut the power off so I could cut the trees and he did and I cut the trees."

Plaintiff also offered evidence tending to show that defendant's electric transmission line was constructed in 1930 or 1931; that the poles were 30 feet in height above the highway where it crossed Haney Branch and the wires then carried 5900 volts; that in 1946 the poles were about same height; that at time of plaintiff's injury and in the Haney Branch section some of the poles were leaning and the wires between the poles were sagging; that one pole 100 to 150 feet from point where plaintiff was injured was propped up; that some of the original poles had rotted off at the ground, and new post bases inserted and old poles spliced to them; and that the wires there were uninsulated.

And in respect to the place of plaintiff's injury, and the surrounding circumstances at the time it occurred, and how it occurred, plaintiff offered evidence tending to show the following:

The Haney Branch culvert involved the excavation, setting of forms, and pouring concrete to complete the job. The work at the Haney Branch was an extension of the culvert that ran under Highway 64. The approximate length of the culvert was 33 feet. From the edge of the old highway to the center of the new highway location was approximately 30 feet. The power line was over the new structure being built, and over the end of the old one. At that point the pavement of the old highway was 16 feet wide. The pole on the east side of the culvert at the Haney Branch was 27 feet from the center, and 19 feet from the edge of the old highway. The one on the west side was 28 feet from the center of the old highway. These two poles were 250 feet apart,—(later said by same witness to be 150 feet apart). The old road at that point was on a fill approximately 3½ feet high, and these poles were down below the fill—the bases of the poles being approximately 3½ feet below the surface of the old road. And the electric wire "was at least 25 to 30 feet from the ground level."

Plaintiff testified in pertinent part: "I am 47 years old . . . carpenter by trade and had 20 years experience up until September 11, 1948. I was employed by T. F. Houser as a carpenter, building and setting forms and concrete culverts on Highway No. 64. My injury occurred at Haney Branch culvert on old highway No. 64. This was an extension of the old culvert on the north side of the old highway to widen and straighten the highway. The highway engineers had already located the new highway. . . . I was down under the bank of the old road at the end of the old culvert when I got hurt . . . At the time I was injured I was working almost under the center of the new highway location. I had been working at that culvert 3 days. We first built and set forms and footings before starting the other part of the culvert. . . . The concrete mixer was set just off the bank of the old highway about 40 feet east of the

culvert where I worked.  A crane with boom and metal cable attached from fly wheel drum to the beam to which a metal bucket was fastened so that the bucket could be lifted and lowered, was used.  The crane swung around north with the bucket to the mixer where the bucket was filled with concrete and then swung back to me and I dumped the concrete to the right place in the form.  The work assigned to me which I was doing when injured was dumping the concrete in the forms 2 or 3 feet from the end of the old culvert at the edge of the old highway.  The power line ran almost directly overhead when I was working at the time . . . I dumped two (2) buckets and on the third bucket I took hold of the handle to dump the third bucket, and that was the last I knew.  The two handles were on the outside of the bucket (and) when operated would spill the concrete through the bottom.  I was closer under the line when I emptied the first two buckets than when I was injured.  Before dumping the concrete we set the top of the beam at 18 inches under the power wire and dogged it at 18 inches under the line.  By dogging it I mean that it fixed it so it would not go higher . . . ."

Then on cross-examination plaintiff testified that his foreman, Paul Cook, had said something to him about being careful about the beam—boom—under these wires; that he knew they were electric wires carrying electricity; and that in working on jobs for contractors for 12 to 15 years some of the work was "around where they had overhead electric wires." Then plaintiff concluded: "James Mallory was operating this crane for T. F. Houser, my employer.  The question of how high the beam was, Mr. Mallory would know what angle or degree he had it, I do not know the degree. . . . Every time I tipped this bucket letting this heavy weight concrete out, it had a tendency to pull it down a little bit and then it went up."  Q. "When the concrete was released from the bucket that let the bucket go up?"  A. "Not let it go up any farther than where it was dogged off.  When the weight comes out of it, it naturally goes up."

And the foreman, Paul Cook, testified: ". . . We moved to the Haney Branch structure . . . September 9th.  Mr. Hutchinson was engineer for the State Highway Commission and submitted to me the plans and specifications for the work. . . . And when we were ready to pour our concrete and the bucket was attached first to our crane then the boom with the bucket was moved under the power line.  Jim Mallory was the operator.  I signalled the operator of the derrick to lower the boom and swing it under the line with the empty bucket.  I know about operating the crane . . . I set the boom or the operator set the boom at a fixed distance which was 2 feet from the power line or wire.  The space between the boom and wire was 2 feet with an empty bucket.  And then we moved the bucket to the mixer, loaded it with concrete and brought it back.  There had been 2 buckets emptied in the form before the acci-

dent happened which was on the third bucket. Everett Mintz's job that morning was to place the concrete in the form and dump it out of the bucket. He stood in the form when a bucket was swung in place. He took hold of the 2 levers which opened the bottom of the bucket and the concrete poured out. . . . The 2 buckets were dumped and then the crane was moved back from the line approximately 3 to 5 feet. The end of the boom had been back out clear from under the line in position when the plaintiff received the injury. The boom could not have touched the line at any height because it was out from under the line at the time plaintiff was hurt. I was approximately 30 feet away when the accident happened. I was watching the operation of the crane as it moved the concrete in the place and about the time he tipped the bucket the arc occurred. I saw the arc leave the power line and connect somewhere on the beam. It appeared like a streak of lightning and came on a 45 degree angle from the line to the boom. The arc appeared to be 12 inches long and came to the arm of the beam when it occurred. I saw Everett Mintz was holding the bucket . . . He was still holding the bucket until the operator swung the boom, then he sank down, and appeared to be dead."

And this witness Cook further testified: "With reference to the elevation of the surface of the highway, . . . the crane was sitting . . . approximately 4 feet below the old highway."

Then on cross-examination, this witness, the foreman of T. F. Houser, continued: "The work that was being carried on by T. F. Houser had no connection with the town of Murphy. We had been excavating with the crane two days before the plaintiff was injured, at this place, excavating for the culvert. The line of the town of Murphy was on the lower edge of old 64. The crane was set up on the bank . . . I was there in charge as foreman for the Houser Construction Co. I had warned the operator of the crane, Mallory, not to come in contact with these wires. I also warned the plaintiff himself that those wires were dangerous and not to come in contact with them . . . . The electric transmission that was maintained by the defendant was visible to me . . . At the time the accident occurred this beam of the crane came up the side of the power line. It didn't pass it from what I could see of the arc it was under the line. When I saw the arc occur, the beam was in this position and I didn't see the beam go up or down . . . I was standing under the line." Q. "You had authority to give directions to the operator of this crane?" A. "I did, and also Mr. Mintz did." And, continuing, "The beam was standing still at the time he took hold of the bucket to dump the concrete." And in reference to setting or dogging the beam, the witness repeated that the beam was set so it could not get closer than 2 feet of those wires; that "at that particular place" he "considered 2 feet safe, which would give us room to work above and below"; but that when he heard the arc and looked up "it looked 12 inches on an angle of approximately

45 degrees from the end of the beam to the wire"; and that he had "worked on electricity for a period of several years before this time" . . . but "nothing directly in connection with the electrical operations."

At the close of all plaintiff's evidence, motion of defendant for judgment as of nonsuit was allowed. Plaintiff excepted, and from judgment as of nonsuit appeals to Supreme Court and assigns error.

*F. O. Christopher, O. L. Anderson, T. M. Jenkins for plaintiff, appellant.*

*Edwards & Leatherwood and John M. Queen for defendant, appellee.*

WINBORNE, J. The sole question here is this: Considering the evidence shown in the record on this appeal in the light most favorable to plaintiff, is there sufficient evidence to take the case to the jury as against the defendant Town of Murphy? The trial court did not consider it sufficient for this purpose. And in this ruling error is not made to appear.

In an action for recovery of damages for injury resulting from actionable negligence of defendant, plaintiff must show: (1) That there has been a failure on the part of defendant to exercise proper care in the performance of some legal duty which the defendant owed the plaintiff under the circumstances in which they were placed. And (2) that such negligent breach of duty was the proximate cause of the injury, a cause that produced the result in continuous sequence, and without which it would not have occurred, and one from which a man of ordinary prudence could have foreseen that such result was probable under the facts as they existed. *Whitt v. Rand,* 187 N.C. 805, 123 S.E. 84; *Murray v. R. R.,* 218 N.C. 392, 11 S.E. 2d 326; *Mills v. Moore,* 219 N.C. 25, 12 S.E. 2d 661; *Luttrell v. Mineral Co.,* 220 N.C. 782, 18 S.E. 2d 412; *Mitchell v. Melts,* 220 N.C. 793, 18 S.E. 2d 406; *Harris v. Montgomery Ward,* 230 N.C. 485, 53 S.E. 2d 536; *McIntyre v. Elevator Co.,* 230 N.C. 539, 54 S.E. 2d 45; *Spivey v. Newman,* 232 N.C. 281, 59 S.E. 2d 844; *Baker v. R. R.,* 232 N.C. 523, 61 S.E. 2d 621.

If the evidence fails to establish either one of the essential elements of actionable negligence, the judgment of nonsuit is proper. *Luttrell v. Mineral Co., supra; Mitchell v. Melts, supra; Thomas v. Motor Lines,* 230 N.C. 122, 52 S.E. 2d 377.

And the principle prevails in this State that what is negligence is a question of law, and when the facts are admitted or established, the court must say whether it does or does not exist. "This rule extends and applies not only to the question of negligent breach of duty, but also to the feature of proximate cause." *Hoke, J.,* in *Hicks v. Mfg. Co.,* 138 N.C. 319, 50 S.E. 703; *Russell v. R. R.,* 118 N.C. 1098, 24 S.E. 512; *Lineberry v. R. R.,* 187 N.C. 786, 123 S.E. 1; *Clinard v. Electric Co.,* 192 N.C. 736,

136 S.E. 1; *Murray v. R. R., supra; Reeves v. Staley,* 220 N.C. 573, 18 S.E. 2d 239; *Luttrell v. Mineral Co., supra; Baker v. R. R., supra.*

In *Lineberry v. R. R., supra,* in opinion by *Clarkson, J.,* it is said: "It is well settled that where the facts are all admitted, and only one inference may be drawn from them, the court will declare whether an act was the proximate cause of the injury or not." See also *Nichols v. Goldston,* 228 N.C. 514, 46 S.E. 2d 320; *Baker v. R. R., supra.*

Furthermore, it is proper in negligence cases to sustain a demurrer to the evidence and enter judgment as of nonsuit under provision of G.S. 1-183, "(1) When all the evidence taken in the light most favorable to the plaintiff, fails to show any actionable negligence on the part of defendant . . . (2) When it clearly appears from the evidence that the injury complained of was independently and proximately produced by the wrongful act, neglect, or default of any outside agency or responsible third person . . . ," *Stacy, C. J.,* in *Smith v. Sink,* 211 N.C. 725, 192 S.E. 108, and cases cited in respect to each principle. See also *Boyd v. R. R.,* 200 N.C. 324, 156 S.E. 507; *Powers v. Sternberg,* 213 N.C. 41, 195 S.E. 88; *Butner v. Speas,* 217 N.C. 82, 6 S.E. 2d 808; *Murray v. R. R., supra; Luttrell v. Mineral Co., supra; Riggs v. Motor Lines,* 233 N.C. 160, 63 S.E. 2d 197.

In *Smith v. Sink, supra,* it is also said: "We had occasion to examine anew this doctrine of insulating the conduct of one, even when it amounts to passive negligence, by the intervention of the active negligence of an independent agency or third party, as applied to variant fact situations, in the recent case of *Beach v. Patton,* 208 N.C. 134, 179 S.E. 446," and others cited. Then, continuing, "These decisions, and others, are in full support and approval of Mr. Wharton's statement in his valuable work on Negligence (Sec. 134): 'Supposing that if it had not been for the intervention of a responsible third party the defendant's negligence would have produced no damage to the plaintiff, is the defendant liable to the plaintiff? This question must be answered in the negative, for the general reason that causal connection between negligence and damage is broken by the interposition of independent responsible human action. I am negligent on a particular subject matter. Another person, moving independently, comes in, and either negligently or maliciously so acts as to make my negligence injurious to a third person. If so, the person so intervening acts as a nonconductor, and insulates my negligence, so that I cannot be sued for the mischief which the person so intervening directly produces. He is the one who is liable to the person injured.' " Then there follows, to like effect, a quotation from *R. R. v. Kellogg,* 94 U.S. 469. See also *Butner v. Speas, supra; Riggs v. Motor Lines, supra.*

A municipal corporation, engaged in the business of supplying electricity for private advantage and emolument is, as to this, regarded as a private corporation,—and, in such capacity is liable to persons injured

by the actionable negligence of its servants, agents and employees. *Fisher v. New Bern,* 140 N.C. 506, 53 S.E. 342; *Harrington v. Wades-boro,* 153 N.C. 437, 69 S.E. 399; *Rice v. Lumberton, ante,* 227.

And this Court declared in *Helms v. Power Co.,* 192 N.C. 784, 136 S.E. 9, that: "Electric companies are required to use reasonable care in the construction and maintenance of their lines and apparatus. The degree of care which will satisfy this requirement varies, of course, with the circumstances, but it must always be commensurate with the dangers involved, and where the wires maintained by a company are designed to carry a strong and powerful current of electricity, the law imposes upon the company the duty of exercising the utmost care and prudence consistent with the practical operation of its business to avoid injury to those likely to come in contact with the wires."

And in *Small v. Utilities Co.,* 200 N.C. 719, 158 S.E. 385, it is said that, "Due to the deadly and latently dangerous character of electricity, the degree of care required of persons, corporate or individual, furnishing electric light and power to others for private gain, has been variously stated." Then after reciting such expressions, the Court said: "In approving these formulæ as to the degree of care required in such cases, it is not to be supposed that there is a varying standard of duty by which the responsibility for negligence is to be determined . . . The standard is always the rule of the prudent man, or the care which a prudent man ought to use under like circumstances. What reasonable care is, of course, varies in different cases and in the presence of different conditions."

Moreover, we find it stated in 18 Am. Jur. 491-2, subject Electricity, Sec. 97, "That the duty of providing insulation should be limited to those points or places where there is reason to apprehend that persons may come in contact with the wires, is only reasonable. Therefore, the law does not compel companies to insulate . . . their wires everywhere, but only at places where people may legitimately go for work, business, or pleasure, that is, where they may be reasonably expected to go. The same rule applies with equal, if not greater, force in regard to placing warning signs." This principle is recognized by this Court in *Ellis v. Power Co.,* 193 N.C. 357, 137 S.E. 163. See also 29 C.J.S. 582—Electricity, Sec. 42.

The mere maintenance of high tension transmission line is not wrongful, and in order to hold the owner negligent, when an injury occurs, he must be shown to have omitted some precaution which he should have taken. 18 Am. Jur. 490—Electricity, Sec. 96.

On the other hand, the law imposes upon a person *sui juris* the obligation to use ordinary care for his own protection, and the degree of such care should be commensurate with the danger to be avoided. Since the danger from uninsulated or otherwise defective wires is proportionate to the amount of electricity so transmitted, contact with such wires

should be avoided where their existence is known. Where a person seeing such a wire knows that it is, or may be highly dangerous, it is his duty to avoid coming in contact therewith . . . . See 18 Am. Jur. 471, Electricity 76. See also *Rice v. Lumberton, ante,* 227.

Furthermore, it may be conceded, for purposes of this appeal, that the State Highway and Public Works Commission is vested with authority to control the uses to which the easements acquired by the State for public highway purposes, may be put, *Hildebrand v. Telegraph Co.,* 219 N.C. 402, 14 S.E. 2d 252; and that in the exercise of such authority the Commission had the right to call upon the Town of Murphy to remove so much of its electric transmission line as interfered with the re-location and improvement of portions of Highway No. 64. And the evidence discloses that the Town of Murphy was co-operating with the request of the Commission in this respect.

And applying the principles of law here stated to the evidence offered by plaintiff, such evidence fails to make out a case of actionable negligence. If it should be conceded that the evidence tends to show that defendant failed to maintain its transmission line in accordance with its legal duty, the evidence fails to show that such failure was a proximate cause of the injury to plaintiff. On the other hand, it clearly appears from the evidence that the injury of which plaintiff complains was "independently and proximately produced by the wrongful act, neglect, or default of an outside agency or responsible third person." There would have been no injury to plaintiff but for the intervening wrongful act, neglect or default of those in control of and operating the derrick, over which defendant had no control, and of which defendant had no knowledge.

The judgment below is
Affirmed.