MARY ELIZABETH ALFORD, ADMINISTRATRIX OF THE ESTATE OF CHARLES S. ALFORD, JR., DECEASED, v. MELVERT WASHINGTON AND THE CITY OF KINSTON, A MUNICIPAL CORPORATION.

(Filed 23 May, 1956.)

**1. Automobiles § 41g—**

Evidence tending to show that the driver along the servient street failed to stop before entering an intersection with the dominant highway in disregard of the stop sign erected on the servient street, and collided in the center of the intersection with a car traveling along the dominant highway, and that one of the cars, as a result of the collision, struck a pole, dislodging a high voltage wire so that it fell across the cars, *is held* sufficient to overrule nonsuit in an action to recover for the death of intestate, electrocuted when he touched one of the cars in attempting to aid the occupants.

**2. Negligence § 11—**

Ordinarily, a person *sui juris* is under obligation to use ordinary care for his own protection, the degree of care required being commensurate with the danger to be avoided.

**3. Electricity § 10—**

A person is under duty to avoid coming in contact with an electric wire which he sees and knows to be dangerous.

**4. Same: Negligence § 11—**

A bystander who sees others in imminent and serious peril through the negligence of another cannot be charged with contributory negligence as a matter of law in risking death or serious injury in attempting to effect a rescue, unless such attempt is recklessly or rashly made.

**5. Same: Automobiles § 42j—**

The evidence tended to show that intestate, an electric welder, came to the scene of the collision immediately after the impact, that a high tension wire had fallen on the tops of the two cars involved in the collision, and was emitting sparks, that children in one of the cars were crying and screaming, and that intestate, in attempting to render aid, touched one of the cars and was electrocuted.  *Held:* Intestate's action in attempting the rescue is not contributory negligence on his part as a matter of law.

DEVIN, J., took no part in the consideration or decision of this case.

APPEAL by defendant, Melvert Washington, from *Moore (Clifton L., Jr.),* at 17 October, 1955 Civil Term, of LENOIR.

Civil action for recovery of damages for alleged wrongful death of plaintiff's intestate.

Opinion on former appeal is reported in 238 N.C. 694, 78 S.E. 2d 915, where judgments of Superior Court (1) sustaining demurrer of defendant City of Kinston, and (2) overruling demurrer of defendant, Melvert Washington, were affirmed.

The facts alleged in the complaint in so far as pertinent to cause of action against defendant Melvert Washington are repeated in summary as follows:

1. Charles S. Alford, Jr., intestate of plaintiff, came to his death at about 10:30 p.m. on 14 June, 1952, at the intersection of East Street and Blount Street in the City of Kinston, N. C.  East Street runs in north-south direction, and is a part of the State Highway system, and is designated as a through street.  Blount Street runs in east-west direction, with stop signs erected and maintained thereon,—one on the north side about 25 feet east of the intersection, and another on the south side about 25 feet west of the intersection.  (This allegation is not controverted.)

2. The City of Kinston, a municipal corporation, owns and operates within its corporate limits an electric power and lighting system, as a part of which there is a street light suspended about 15 feet above the paved surface over the approximate center of said intersection, by means of a wire attached to two poles, one of which was located a few inches from the curbing on the northwest corner of said intersection, and the other a few inches from the curbing on the southeast corner of the intersection.  The light was supplied with current by means of high voltage wires attached thereto and hanging over the intersection parallel to the supporting line.  (This allegation is not controverted.)

3. And the complaint also alleges that at about 10:30 p.m. on 14 June, 1952, defendant, Melvert Washington, hereinafter referred to as defendant, operated his automobile, a 1948 Plymouth sedan, hereinafter referred to as the Plymouth car, westerly along Blount Street in

unlawful, wrongful and negligent manner, among others as follows: (a) Without bringing his car to a stop, as he approached the intersection, and failing to yield the right of way to through traffic proceeding north and south on East Street, in violation of law at such intersection; and (b) without keeping a proper lookout and without heeding the stop sign located on the north side of Blount Street when he saw, or in the exercise of ordinary diligence, should have seen the approach of a Nash sedan, hereinafter referred to as the Nash car, proceeding northwardly on East Street in said intersection or entering it, and when he knew, or in the exercise of ordinary diligence, should have known that he could not clear the said intersection without colliding with, or being struck by the Nash car, and that, while so proceeding through the intersection, in the manner aforesaid, defendant caused his Plymouth car "to be collided with" by the Nash car, and to be hurled against the pole which was located near the curbing at the northwest corner of the intersection, jarring the support wires loose from the pole, thereby causing the exposed high voltage wires, supplying current to the light, to fall across or upon the Nash car, and charging it with electric current or voltage of such high degree as to produce instant death to plaintiff's intestate as he reached the scene of the accident and sought to rescue the entrapped occupants of the Nash car, which acts of negligence on the part of defendant were the "direct and proximate cause of the injury and death of plaintiff's intestate, in the manner . . . alleged."

And defendant Melvert Washington filed answer in which in so far as the allegations of the complaint relate to him he admits: That on 14 June, 1952, at about 10:30 p.m. he was the owner of a 1948 model Plymouth sedan and was operating it in 'a westerly direction over Blount Street in the City of Kinston at the time referred to in the complaint; and that for some time prior to that date, East Street in the said city, had been designated as a part of the State Highway system.

And defendant denies all other material allegations of the complaint.

And defendant "for further answer and defense to the alleged cause of action and to the complaint, herein filed, and as a bar to plaintiff's cause of action," avers in pertinent part substantially the following:

1. That he was not guilty of any negligence in connection with the operation of his Plymouth car at time it was run into by the Nash car, owned by J. B. Cauley, being driven by George Edward Cauley, as the servant, agent and employee of J. B. Cauley, and that whatever injuries plaintiff's intestate suffered were not due to any want of care or wrongful conduct on the part of this defendant, but were due to the negligent, wrongful, and unlawful conduct of plaintiff's intestate and to his contributory negligence as hereinafter more fully alleged.

2. That defendant avers upon information and belief that plaintiff's intestate, at the time of his death, was a welder, accustomed to working with electric welding machines and possessed considerable knowledge as to the use of electrical instruments, and knew that wires carrying electric current to street lights carried sufficient voltage to be likely to inflict serious bodily injury or death, and knew that a person standing upon the ground and touching one of the wires or any other metal object against which such wires were resting would cause an electric current of like force to flow through his body.

3. That defendant also avers upon information and belief that the persons in the Nash car, immediately after the collision of it with defendant's Plymouth car, were in no immediate danger for that the rubber tires upon said car afforded them sufficient insulation to prevent the grounding of said electric wires, rendering the current therefrom ineffective as to said occupants of the Nash car. And defendant avers, upon information and belief, that plaintiff's intestate, notwithstanding his expert knowledge of the dangerous character of electricity, carelessly and negligently and with reckless abandon of the exercise of ordinary care, unnecessarily and in a reckless and rash manner, approached said car, well knowing that said electric wires were lying across the same and were charging the metal parts of said car with electric current and causing visible electric sparks,—which he saw, or in the exercise of ordinary care, should have seen.

4. That all of the conduct and acts of negligence on the part of plaintiff's intestate, as herein alleged, were the direct and proximate cause of his death, and defendant pleads same as contributory negligence in bar of plaintiff's recovery on her alleged cause of action.

Thereupon defendant prays that plaintiff recover nothing from him, and that he go hence without day, and that plaintiff be taxed with the cost.

Plaintiff replying, reiterates the allegations of her complaint, and denies each of the averments made by defendant except such portions thereof as conform to the facts set forth in the complaint.

And upon the trial in Superior Court plaintiff offered evidence which she contends tends to support the allegations of her complaint as set forth in the third paragraph of allegations in the complaint in manner following:

I. In respect to collision:

George William Cauley, witness for plaintiff, testified in pertinent part: "I was driving the Nash . . . going north on East Street just prior to the accident. My brother Burcell and his wife and four children were . . . with me. The children were all in the back seat,—my brother's wife was sitting in the middle, and he was on the right-hand

side of the car, and I was on the left side . . . I was operating my car at about 18 to 20 miles per hour as I approached the intersection of East and Blount Streets. As I approached that intersection, I glanced to my left. My brother's wife hollered 'Look out, he is going to get you.' When I cut my eyes back, this Plymouth was in front of me. The only thing I saw was his headlights. The car with which I collided did not stop at the intersection. I couldn't say at what speed he was traveling . . . I don't know what happened to me in the collision because when we went together, I just went out . . . I did not regain consciousness at the scene of the accident . . . The other occupants of my car were in the car when they were hurt . . . I do know they were hurt in the wreck."

Mrs. Sallie W. Cauley, wife of Burcell Cauley, also witness for plaintiff, testified in pertinent part that she also had her eighteen months old baby with her on the front seat on the right and that her husband was in the middle, and that four of her children were in the back seat. She said: "The first thing that attracted my attention about the car we had a collision with was the lights . . . I remember seeing the lights of the car coming, and I hollered to my brother-in-law, 'Look out, George, he is going to hit us'; . . . that's all I remembered for several days. I did not form an opinion as to the speed."

J. B. Cauley, also witness for plaintiff, testified in pertinent part: "I was riding in the center of the front seat . . . My wife was sitting in the front seat, right-hand side . . . All I can say is about what she said . . . and I saw the light; that's all I remember . . . The collision between the cars knocked me out. I regained consciousness while I was at the scene of the accident . . . I remember a man dragging me out and feeling my feet dragging."

And Dewey Merritt, sergeant of police force of the city of Kinston, testified in pertinent part that there was no obstruction to the view of the Stop sign as "you approach the intersection"; and that on the next day after the collision defendant said he didn't know whether there was a Stop sign there or not; that he did not stop.

This same witness also narrated the result of his investigation as follows: That in his official capacity he had occasion to investigate the accident at the intersection of East and Blount Streets; that two automobiles appeared to be involved in the accident—a Plymouth, headed right head-on into the pole on the northwest corner,—the other car, a Nash, jammed up against the back end of the Plymouth with the radiator headed south and the right rear fender jammed against the boot of the Plymouth; that just slightly north of the center of Blount Street and just about the center east of the center line of East Street there was found the headlights of the Nash, part of the bumper guards

off the front of the Nash, and a piece of chrome from the Plymouth, between 4 and 6 feet from the center line, and a lot of dirt; that from this point there were skid marks right up to the Plymouth, and there were skid marks to the Nash; that a wire had fallen down across the top of the Plymouth and across the top of the Nash, the same wire across both cars; that the end of it was in the street in the center of the intersection or thereabouts, and there was another wire hanging down; that it was an electric wire from one of the poles; that the pole was broken in two places, but still standing; that two wreckers had to be used to pull the cars apart; that the front end of the Nash, the hood, the grille, all the lights—were bent or pushed to the left, and the left side of the Plymouth was pushed back toward the back fender; and that after the occupants of the Nash had been removed to an ambulance and on to the hospital, he was trying to get up with the driver of the Plymouth; that he asked several people if they knew the driver, and one of them he afterwards learned was defendant Washington, and he said he did not know; but that between an hour and an hour and a half after the accident Washington came to the police station, and said he was the driver of the Plymouth; and that at both times Washington had the odor of having been drinking intoxicating beverages.

II.  In respect to alleged rescue:

Mary Elizabeth Alford, widow of Charles S. Alford, testified on direct examination that on 14 June, 1952, "I was living . . . about two and a half blocks from the intersection of Blount and East Streets. I was at home that night.  The last time I saw my husband before the accident was when he left to go to the accident.  I heard the impact. He left immediately after the impact.  He traveled to the collision in his truck . . . He was a welder, and had been doing that sort of work for approximately 12 years . . . He was 35."

Then on cross-examination she testified: "Mr. Alford was an electric welder, and had been engaged in electric welding 12 years.  He had gone to Newport News Shipbuilding and Dry Dock Company to take a course in electric welding.  He was working for himself."

Plaintiff also offered the testimony of others, as follows:

Thomas E. Harper, who worked at a funeral home on E. Blount Street, second house from the corner, east of the intersection of East Street and Blount Street, testified: "On the night of June 14 I left the funeral home to go to a neighbor's house, and I seen this car coming down Blount Street.  I made it across the street, and about the time I got in the house, I heard a collision.  I turned and ran back out.  Someone said 'Don't run, the wire is down,' and fire was flying all over one of the cars.  I don't know which one . . . After the collision a man drove up, pulled to the left of the curb.  He went up there and put his

hands on one of the cars; I don't know which car it was. He just blanked out . . . He did not move any from the time I saw him fall until I got there with the ambulance . . . After I saw him fall it didn't take over two or three minutes to get the ambulance there and put him in it . . . I saw somebody in both cars. I knew there were people in both cars when I went back to pick up this other man to put him in the hearse. That was the man with Mr. Alford. Some were trying to get out and some were out. They were hollering, some children. I do not know how long they continued to holler. Just as soon as we got this other man up, we left . . . They were hollering when we left."

Then on cross-examination this witness continued: ". . . I was (in) second house from corner right where it happened . . . Lillie Simms lived there. I was going in the door of the house when I heard the collision. When I came out of the house I started out to the scene. The truck drove up as I came out of the house. It was right behind this car coming down Blount Street. . . . The truck came by the funeral home going toward the intersection. It came from east to west along Blount Street . . . The truck, when it seen the accident, pulled right out and stopped in front of Miss Lillie Simms' house, got out of his truck and walked to the scene. I was standing there looking, standing on the sidewalk in front of . . . house. I saw this man . . . walk to the corner. I don't know which car he went to. I saw him when he put his hand on one of the cars; I don't know which one. He put his hand on the car just once. I don't know which part of the car he touched. One of the cars was on East Street, on the other side, up against the telephone pole. The other one was out in the street-like. The back of it was up against the other one, I think . . . I was looking at him touch the car . . . it looked to me it was around middleway of one of the cars . . . but I couldn't tell which car he was touching. I am sure he parked in front of Lillie Simms' house . . . Mr. Webb went to the funeral home and called for the ambulance. I went to get the ambulance in the driveway between the church and the funeral home. I couldn't say how many people were in the street. Right at that time, as fast as they gathered, I would say as many as 25 or 30 head. When I heard it hit, I ran back out there and seen some sparks . . . coming from one of them cars. There were right smart of them. It was still sparking when Mr. Alford walked up there. It was sparking when he fell over . . ."

William Webb, an undertaker, whose funeral home was located approximately 100 yards from the intersection of Blount and East Streets, testified in pertinent part: ". . . I did not see the actual wreck between the Cauley automobile and the automobile driven by Melvert Washington, but I saw it immediately after it happened. I was sitting in front of my funeral home in an automobile which was facing east on

Blount Street and the back of it west . . . I . . . heard a lot of noise. I turned and saw there was an accident on the corner. These cars had hit. Two cars were together . . . one . . . against the post and the other right next to it, and at that time the street wire had fallen because I could see the sparks. I rushed in the funeral home and called the police department . . . I heard a child crying . . . . I went to the door to try to see, and I walked out in the street and saw this man walking to the automobile that was against the post . . . It was told to me it was Mr. Alford . . . At the time . . . there was a wire that had fallen across the automobile and a few sparks coming every once in awhile from the wire as if there was a break in the wire some place. Several people were out there, and they began to holler, 'Don't go over there, that wire is down.' He went to the car, reached in the car as if he had been trying to cut off the ignition. He put his hand in once, pulled his hand out, and he tried it a second time and pulled it out, and the third time he tried it, he fell back like that, drawed up both hands and feet, and I called the boy that helped me to get the ambulance . . . . There was a motor to a car racing, but which car I wouldn't know. All I know there was a lot of noise. I wasn't right close to the car. You could hear a child hollering and a lady saying, 'My baby is hurt.' What car it was coming from I don't know. People were saying not to go near the car. Personally, I don't know whether Mr. Alford heard those statements. I was on one side of the street and the people on the other side were saying, 'Don't go to the car.' They were saying 'Don't go to that car, there is a live wire across it.' Whether Mr. Alford heard it or not, I could not say."

And the witness continued: "When I first saw Mr. Alford, he was coming across East Street on the west side of Blount Street, coming from the south going toward north of Blount Street . . . I imagine it was about 10 or 15 minutes, or maybe more, before another ambulance came up . . . The police officer, Sgt. Merritt, and the ambulance came up about the same time . . . I don't know definitely when the current was cut off to that wire that was broken, across the cars."

Then on cross-examination the witness Webb stated: ". . . Alford . . . was coming from the southwest corner of Blount and East. He went directly across to this car. He was on the side of the car so that I could see him." And on re-direct examination, the witness stated: "I don't know how long Mr. Alford had been there before I saw him walk across to where the cars were. I didn't see him when he came up. The only thing I know; I saw a man walking from one side to the other."

Then on re-cross-examination the witness said: "The truck driver did not park right across the street from where I was sitting in my car at that time. I didn't see Mr. Alford walk from in front of my place down to the automobile . . ."

Sgt. Dewey Merritt being recalled testified that when he arrived at the scene George Cauley and Burcell Cauley were in the Nash, George sitting in the front seat under the wheel; that they were all so mixed up in there and hollering; that he noticed the hollering by the occupants of the Nash car when he drove up—"three or four kids in there . . . screaming."

The defendant offered no evidence and the case was submitted to the jury upon these issues, which the jury answered as indicated:

"1. Was the death of plaintiff's intestate, Charles S. Alford, caused by the negligence of the defendant Melvert Washington, as alleged in the complaint? Answer: Yes.

"2. Did plaintiff's intestate, Charles S. Alford, through his negligence contribute to his injury and death, as alleged in the answer? Answer: No.

"3. What damages, if any, is plaintiff entitled to recover of the defendant Melvert Washington? Answer: $25,000.00."

To judgment in accordance therewith defendant Melvert Washington excepted and appeals to Supreme Court, and assigns error.

*Jones, Reed & Griffin for Plaintiff Appellee.*
*White & Aycock for Defendant Appellant.*

WINBORNE, J. The foremost question on this appeal is whether or not the trial court erred in overruling plaintiff's motion for judgment as of nonsuit.

In respect thereto the evidence offered upon the trial in Superior Court is sufficient to make out a case against defendant for actionable negligence in connection with the collision between his Plymouth car and the Cauley Nash car as a result of which it clearly appears the electric wire was jarred loose from the poles, and dropped down upon the two cars. Hence the evidence is fully sufficient to support a finding by the jury of negligence on the part of the defendant in bringing about the situation disclosed by the evidence. And the evidence is sufficient to support a finding by the jury that the situation so brought about was one in which the occupants of the cars were in apparent peril and imminent danger of life or bodily injury.

Therefore, question arises as to whether plaintiff's intestate was guilty of contributory negligence in doing what the evidence tends to show he did do.

Ordinarily the law imposes upon a person *sui juris* the obligation to use ordinary care for his own protection, and the degree of such care should be commensurate with the danger to be avoided. *Rice v. Lumberton,* 235 N.C. 227, 69 S.E. 2d 543; *Mintz v. Murphy,* 235 N.C. 304, 69 S.E. 2d 849. Thus where a person seeing an electric wire knows that

it is, or may be highly dangerous, it is his duty to avoid coming in contact therewith. See 18 Am. Jur. 471, Electricity 76; also *Rice v. Lumberton, supra; Mintz v. Murphy, supra; Alford v. Washington, supra.*

But "the rule is well settled that one who sees a person in imminent and serious peril through the negligence of another cannot be charged with contributory negligence, as a matter of law, in risking his own life, or serious injury, in attempting to effect a rescue, provided the attempt is not recklessly or rashly made." See Annotation 19 A.L.R. 4 on subject "Liability for death, or injury to, one seeking to rescue another." And the annotator of decided cases there goes on to say that some of the cases do not state the proviso, but probably it is implied in practically all of them. It is said, however, "All agree that the fact that the injury is sustained in attempting to save human life is a proper element for consideration upon the question of contributory negligence, and that the latter question ordinarily is one for the jury, and not for the Court." Attention is then called to cases in other jurisdictions, as well as *Norris v. R. Co.,* 152 N.C. 505, 27 L.R.A. (N.S.) 1069, 67 S.E. 1017.

In the *Norris case, supra,* our own Court, in opinion by *Hoke, J.,* speaking of a situation the evidence tended to show was due to negligence of defendant, declared: "This being true, it is well established that when the life of a human being is suddenly subjected to imminent peril through another's negligence, either a comrade or a bystander may attempt to save it, and his conduct is not subjected to the same exacting rules which obtain under ordinary conditions; nor should contributory negligence on the part of the imperiled person be allowed, as a rule, to affect the question. It is always required in order to establish responsibility on the part of defendant, that the company should have been in fault, but, when this is established, the issue is then between the claimant and the company; and when one sees his fellow-man in such peril he is not required to pause and calculate as to court decisions, nor recall the last statute as to the burden of proof, but he is allowed to follow the promptings of a generous nature and extend the help which the occasion requires; and his efforts will not be imputed to him for wrong, according to some of the decisions, unless his conduct is rash to the degree of reckless; and all of them hold that full allowance must be made for the emergency presented.

"This principle is declared and sustained in many well-considered and authoritative decisions of the courts and by approved text-writers, and prevails without exception, so far as we have examined," citing cases and quoting from some of them.

Applying this principle to the facts presented in instant case, the trial judge properly overruled defendant's motion for judgment as of

nonsuit and fairly submitted the case to the jury upon a charge, considered contextually, free from prejudicial error.

Hence the various assignments of error, based upon exceptions taken during the course of the trial, and to the charge of the court, and to the alleged failure of the court to properly charge, after due consideration fail to disclose harmful error. Therefore, in the judgment from which appeal is taken there is

No error.

DEVIN, J., took no part in the consideration or decision of this case.