LUCILLE G. FLOYD, ADMINISTRATRIX OF THE ESTATE OF JIMMY FLOYD, v. HAROLD M. NASH AND WIFE, MARY EVELYN NASH AND DUKE POWER COMPANY.

(Filed 23 November, 1966.)

1. **Electricity § 5—**
    It is not negligence *per se* for a power company to maintain an uninsulated wire 19 feet above the ground along its right of way across a farm, and it may not be held liable for the death of a workman electrocuted while engaged in filling a feed tank constructed under such wire when the evidence discloses that the feed tank was constructed after the power line was in use, and there is no evidence that the power company knew that the feed tank had been constructed on its right of way.

2. **Negligence § 33—**
    The mere fact that the owner of land permits the construction of a feed storage tank under the power line on the right of way of a power company cannot constitute basis for liability of the landowner to an employee of the owner of the storage tank who was electrocuted while attempting to fill the tank when a part of the unloading apparatus came in contact with the wire, the owner of the land not having given any instructions as to where the driver's truck should be stopped or how the unloading apparatus should be operated.

3. **Electricity § 8—  Evidence held to disclose contributory negligence on part of workman in coming in contact with wire he knew to be charged.**

Decedent was engaged in delivering feed into a storage tank having its top some three feet below a power line. In unloading the feed from the truck it was not necessary to raise the blower pipe more than four or five inches above the top of the tank. The evidence further disclosed that defendant driver had delivered feed into the storage tank some two or three times a week for six months prior to the fatal occurrence, and that on the occasion when he was electrocuted he raised the blower pipe so that it came in contact with the power line, and that he knew of the presence of the power line and that it was carrying electric current, although he did not know the exact voltage. *Held:* The evidence disclosed contributory negligence as a matter of law on the part of decedent.

APPEAL by plaintiff from *Brock, S.J.,* at the August 1966 Special Session of UNION.

This is an action for wrongful death. The complaint alleges that Jimmy Floyd was instantly killed on 11 January 1963, when a blower pipe attached to a feed truck, the contents of which he was about to discharge through the pipe into a storage tank upon the farm of the defendants Nash, came in contact with an uninsulated power line of the defendant Power Company. It alleges that the defendants Nash were negligent in constructing the feed tank directly beneath the power line and the Power Company was negligent in permitting it to remain there upon its right of way.

The defendants filed answers denying their own negligence and pleading contributory negligence by the deceased. In addition, the Power Company pleads the negligence of his employer, McMillan Feed Mills, Inc., as an intervening, insulating cause, and also as a bar to the right of the employer or its insurance carrier to recover on account of benefits paid pursuant to the Workmen's Compensation Act.

At the conclusion of the plaintiff's evidence, a judgment of nonsuit was entered in favor of each defendant. The plaintiff appeals from the judgments so entered in favor of the Power Company and Mr. Nash. There is no appeal from the judgment so entered in favor of Mrs. Nash.

The evidence, taken in the light most favorable to the plaintiff, may be summarized as follows:

The deceased died immediately as the result of an electric shock received when the blower pipe, attached to the truck, came in contact with the power line while the deceased was in the process of raising it in order to place it in position above the feed tank so as to discharge into the tank the contents of the truck.

The feed tank was constructed about a year prior to this occur-

rence. It is in the shape of a cylinder or a truncated cone. Upon its top was a lid, hinged upon the side away from the power line. To put feed into the tank, it was necessary to climb a ladder to the top of the tank and open this lid. In so doing, one faced the power line. The blower pipe upon the truck was then manoeuvered into position above this opening so that the feed could be deposited into the tank. The nearest point of the perimeter of the tank was four feet, four inches from a vertical line extending from the ground to the power line. The power line was approximately 19 feet above the ground, three feet higher than the top of the tank. It was uninsulated and its normal load was 7200 volts. The deceased knew of the presence of the power line and that it was carrying electric current, though he did not know the exact voltage. He had delivered feed into this tank two or three times a week for six or eight months prior to this occurrence. He and Mr. Nash discussed the presence of the power line when he first began making these deliveries.

The blower pipe lay in a cradle on the top of the truck. It was raised with a hydraulic control to the height desired and then swung around by hand into the position for unloading. The truck and the tank were about the same height. In order to unload the truck, it was not necessary to raise the blower pipe more than four or five inches above the top of the tank.

At about noon on the day of his death, the deceased drove the feed truck to the Nash farm and stopped it beside the tank and beneath the power line. The weather was clear. There was no surviving eye witness to what then occurred. Upon hearing an explosive noise, Mr. Nash, who was 100 yards away and whose view was cut off by an intervening building, went to the scene and observed that the truck was backed up beneath the power line. It had never before been stopped in that position for unloading. The blower pipe, which was some 18 feet in length, was raised to a 90 degree angle and was in contact with the power line. The power line was about the size of a man's little finger. There were no signs erected warning of high voltage on the line.

Mr. Nash is an electrician as well as a farmer. He had a contract with the McMillan Feed Mills for the raising of chickens. The feed tank was near to and used in connection with the chicken house. The chickens, the feed in the tank and in the truck, and the truck and blower pipe were all property of McMillan Feed Mills. The tank was constructed on the Nash farm by its predecessor in that business, and was not owned by Mr. Nash. It was erected upon the right of way which had been granted to the Power Company by a former owner of the farm.

The chicken house was built by Mr. Nash approximately two

years prior to this occurrence. The Power Company knew of its construction, but there is no evidence that the Power Company was notified of the construction of the feed tank, which was built after the construction of the chicken house. The meter for all electricity used on the Nash farm was at the dwelling house, from which the tank was not visible. The Power Company caused the meter to be read once a month. To reach it, the employee of the Power Company used a road other than the one which led to the chicken house and feed tank.

When the company which constructed the feed tank, and which originally had a contractual arrangement with Mr. Nash, went out of business, the McMillan Feed Mills entered into its contract with him concerning the raising and feeding of its chickens. Prior to so contracting, it inspected the chicken house and feed tank. Periodically, it sent its driver, the deceased, to check the amount of feed in the tank and fill it so as to meet the requirements of the chickens. Mr. Nash did not give the deceased any instructions as to where or how to place the truck or the blower pipe for unloading. Regardless of where the truck stopped to unload, it was necessary to swing the blower pipe beneath the power line in order to reach the tank.

Other evidence was introduced with reference to the life expectancy and earning power of the deceased, and to show that he had never worked as an electrician or had any education with reference to electricity.

*Griffin and Perry* for plaintiff appellant.
*Harold D. Coley, Jr., William I. Ward, Jr., Carl Horn, Jr. and Richardson & Dawkins* for defendant Power Company.
*Coble Funderburke* for defendants Nash.

PER CURIAM. There is no evidence in the record to show, or to support an inference, that the Power Company knew of the existence of the feed tank or had any notice that it would be constructed. It was built after the power line was constructed and in use. This distinguishes the present case from *Essick v. Lexington*, 233 N.C. 600, 65 S.E. 2d 220, and brings it within the rule of *Philyaw v. Kinston*, 246 N.C. 534, 98 S.E. 2d 791, insofar as negligence by the Power Company is concerned.

It is not negligence *per se* for a power company to run an uninsulated wire 19 feet above the ground along its right of way across farm land and to use it for the transmission of power at high voltage. See *Davis v. Light Co.*, 238 N.C. 106, 76 S.E. 2d 378, a stronger case for the plaintiff than the present one.

The evidence shows that the defendant Nash did not construct, determine the location of, own, control or use the feed tank. At the most, he permitted its construction by another upon his land and its use by the employer of the deceased for the storage of its feed. The evidence is that when the deceased first began making deliveries to this tank, six months prior to his death, he and Nash discussed the presence of the power line, the nature of that discussion not being shown in the evidence. Nash did not give any instruction to the deceased as to where the truck should be stopped or how the blower pipe should be operated. Under these circumstances, the mere fact that Nash had superior knowledge of electricity will not support a finding of negligence by him, in the absence of anything to indicate to him that the deceased did not have an awareness of the danger inherent in an electric power line, such as is generally possessed by adults of normal intelligence.

Even if negligence by either of these defendants could reasonably be inferred upon the evidence in this record, the evidence leads inescapably to the conclusion that the deceased, and certainly his employer, who inspected the premises before sending the deceased thereon, was guilty of contributory negligence. Knowing of the presence of the power line, and having filled this tank on many previous occasions, the deceased, for some unknown reason, permitted the metal blower pipe to rise far higher than necessary and to come in contact with the power line. This tragic lapse of attention to a known danger in the immediate vicinity must be deemed negligence by the deceased. See *Lewis v. Barnhill,* 267 N.C. 457, 148 S.E. 2d 536.

The deceased was not a child, and there is nothing to indicate that he did not have normal experience and intelligence. Under these circumstances, the fact that he was not specifically educated or trained in the use and dangers of electricity does not absolve him from the duty to use the care which a man of ordinary prudence would use in manoeuvering a metal pipe in the vicinity of an electric power line. In spite of the deceased's lack of training in the handling of electricity, we think that the evidence leads inescapably to the conclusion that he failed to use the care of a reasonable man, knowing what he knew concerning the presence of the power line, and that his failure to do so was a contributing cause of his death. The contrary view expressed in *Essick v. Lexington, supra,* is not consistent with the later opinion in *Mintz v. Murphy,* 235 N.C. 304, 69 S.E. 2d 849, and is hereby disapproved.

Affirmed.