JAMES L. MARTISHIUS AND CINDY K. MARTISHIUS v. CAROLCO STUDIOS, INC.

No. 175A01

(Filed 10 May 2002)

## 1. Premises Liability— injury from contact with power line—directed verdict—judgment notwithstanding the verdict

The trial court did not err by denying defendant motion-picture studio owner's motions for directed verdict and judgment notwithstanding the verdict on the issue of defendant's negligence in a case where plaintiff carpenter came into contact with uninsulated energized power lines while working on defendant's premises to build a film set, because: (1) defendant's retention of substantial authority over the use of its property, taken together

MARTISHIUS v. CAROLCO STUDIOS, INC.

[355 N.C. 465 (2002)]

with its active involvement in the film production company's daily routines, placed upon defendant a concomitant duty to exercise reasonable care to ensure that the production company's employees including plaintiff were not injured by coming into contact with uninsulated power lines running over the back lot; (2) defendant had a duty to exercise such reasonable care as a landowning proprietor, running a motion-picture studio while maintaining a significant degree of control over the daily operations of its licensees, would exercise under the circumstances; (3) given the evidence to the jury concerning the nature and use of the property, the knowledge of defendant through its facility manager of the set conditions, and the available alternatives, there was sufficient evidence to submit to the jury the question of whether defendant was negligent in causing plaintiff's injuries; (4) defendant has not been held to a strict-liability standard since defendant's liability was based upon the particular facts of the case, including defendant's awareness that the film production employees would be working within the power-line easement and defendant's failure to take reasonable steps to protect plaintiff; and (5) it was not unforeseeable as a matter of law that the type of injury plaintiff sustained would result from defendant's alleged negligence.

2. **Premises Liability— contributory negligence—injury from contact with power line—directed verdict—judgment notwithstanding the verdict**

The trial court did not err by denying defendant motion-picture studio owner's motions for directed verdict and judgment notwithstanding the verdict on the issue of plaintiff carpenter's contributory negligence in a case where plaintiff came into contact with uninsulated energized power lines while working on defendant's premises to build a film set, because: (1) while the general rule is that a person has a legal duty to avoid open and obvious dangers including contact with an electrical wire he knows to be dangerous, that does not mean that a person is guilty of contributory negligence as a matter of law if he contacts a known electrical wire regardless of the circumstances and regardless of any precautions he may have taken to avoid the mishap; and (2) the jury properly considered and resolved the conflicting evidence to reach a verdict as to contributory negligence.

## MARTISHIUS v. CAROLCO STUDIOS, INC.

[355 N.C. 465 (2002)]

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 142 N.C. App. 216, 542 S.E.2d 303 (2001), finding no error in a judgment entered 23 July 1999 and subsequent oral orders denying defendant's motion for judgment notwithstanding the verdict and for new trial entered by Cobb, J., in Superior Court, New Hanover County. Heard in the Supreme Court 12 September 2001.

*Kirby & Holt, L.L.P., by David F. Kirby and Isaac L. Thorp, for plaintiff-appellees.*

*Law Offices of William F. Maready, by William F. Maready; and Smith Helms Mulliss & Moore, L.L.P., by James G. Exum, Jr., for defendant-appellant.*

EDMUNDS, Justice.

Plaintiffs James L. Martishius (plaintiff) and Cindy K. Martishius initiated this negligence action against Carolco Studios, Inc. (defendant) for injuries sustained on 1 February 1993 when plaintiff came into contact with uninsulated energized power lines while working on defendant's premises. Now before this Court are the issues of whether the Court of Appeals erred in affirming the trial court's denial of defendant's motions for directed verdict and for judgment notwithstanding the verdict regarding negligence and contributory negligence. For the reasons set forth below, we affirm the holding of the Court of Appeals.

An understanding of the issues presented in this appeal requires an explication of the relationships between the parties. In 1984, Dino DeLaurentis and the North Carolina Film Corporation (Film Corporation) acquired and built a motion picture studio on a thirty-two-acre site in Wilmington, North Carolina. Over time, the studio, which began as a single building, expanded to include several stages, and a back lot was constructed for outdoor filming. During 1984, Film Corporation hired engineer Gerald Waller to assist in construction of the facilities and to design an electrical distribution system for the premises. Waller presented to Film Corporation various options for the provision of electricity to the back lot, including overhead lines and buried lines. Factors affecting the decision as to which option to select included the costs of burying lines (which Carolina Power & Light (CP&L), the electricity supplier, would pass on to Film Corporation), the aesthetic considerations of having exposed lines, safety, and the requirements of any future expansion. Film

MARTISHIUS v. CAROLCO STUDIOS, INC.

[355 N.C. 465 (2002)]

Corporation elected to have CP&L install uninsulated overhead power lines to the back lot.

The original separation between the back lot and the newly installed power lines was seventy-five feet from the rear of the lot and twenty-five feet from the side. However, as the studio continued operation and new films were produced, the separation between the power lines and the back lot diminished. This shrinkage did not end when defendant became the owner of the studio in 1989. That same year, defendant promoted Waller to the position of facility manager. Jeffrey Schlatter, construction coordinator for Crowvision, Inc., an independent production company involved in this case, testified that from 1984 through 1993, the back-lot set expanded toward the power lines with each subsequent production. On one occasion, Waller requested that some of the back lot's power lines be relocated because of their dangerous proximity to the back lot during the filming of "Aunt Julia, the Script Writer." On another occasion, Waller agreed with a production coordinator of the movie "Teenage Mutant Ninja Turtles" to de-energize a portion of the back lot when construction was to take place approximately fifteen feet from power lines.

Waller aptly described the back lot as a constantly changing construction zone. Production company employees working on the back lot frequently attached large facades to telephone poles that were thirty to forty feet high to create a particular set. A number of these poles had been left from prior productions; in fact, plaintiff presented at trial an aerial photo of the back lot taken in February 1992, almost one year before the instant accident, showing such poles standing within ten to twelve and a half feet of the power lines. A set facade would appear in the film as if it were a building or other part of a scene. As one witness testified, the facade "would be very real, and it is composed of, this street here, of telephone poles. You imagine the city of Wilmington, a facade, pieces of plywood with fake bricks put on and windows cut in them, . . . with telephone poles behind it holding it up, instead of buildings back there."

In order to attach facades to poles at heights exceeding thirty feet, production company workers frequently used mobile boom lift machines. The lifts used in the instant case were manufactured by JLG Industries, and the parties consistently referred to the lifts as "JLGs" (JLG). A JLG resembles a "cherry picker" and was described by one of plaintiff's witnesses as "a piece of equipment that has tires and can move from spot to spot, rotates around with an extending

boom, work platform, so that it will get to high places, things that you can't get with a ladder or scaffolding." The operator of a JLG usually stands in a basket at the end of the extendable boom. In addition to attaching and dismantling facades, JLGs were used in a variety of ways on a movie set. Construction foreman Ralph Woolaston testified that based on his experience working in the film industry since 1978, JLGs are also used for construction and dressing of sets, setting and holding backdrops, and filming. Plaintiff produced substantial testimony at trial from film industry workers that JLGs routinely and customarily were used on both the front and back of the poles to attach and take down facades. One of the workers testified: "We were constantly working the back of the facade. There was all kinds of movement, all kinds of machinery."

A construction access road, used for moving materials and pre-built pieces, ran directly underneath the power lines serving the back lot. This road separated the back lot from an area known as the "bone yard," where sets from previous movies were stored. Although the bone yard belonged to defendant, movie production companies could, with permission from defendant, reuse some of the pieces kept there. Workers using motorized equipment such as JLGs to gather material from the bone yard or to travel to the rear lot by means of this access road therefore drove beneath the power lines. The JLG operated by plaintiff was on this access road at the time of his 1 February 1993 accident.

As noted above, defendant became the owner of the studio in 1984. Defendant made one film of its own, then elected to rent the facilities to independent production companies. Crowvision was thereafter formed to produce the movie "The Crow," and Crowvision and defendant entered into an agreement on 29 December 1992. Under this agreement, defendant gave Crowvision a license to use a portion of defendant's facilities, equipment, and personnel "for the purpose of producing [a] motion picture[]." The agreement further required Crowvision to obtain approval from defendant before making any alterations to the studio property. Defendant warranted "that the licensed premises and facilities hereunder are satisfactory and in a safe condition."

Before production began on "The Crow," Waller, defendant's facility manager, toured the facilities and back lot with Schlatter, Crowvision's construction coordinator. Waller stated that the purpose of the "walk-through" was to "discuss the work environment, the conditions of the backlot [sic], to discuss what their needs were,

MARTISHIUS v. CAROLCO STUDIOS, INC.

[355 N.C. 465 (2002)]

and again, to make them aware of the environment." Schlatter's and Waller's inspection included the overhead power lines that then were in the vicinity of the back lot. These lines consisted of three parallel lines five feet apart. The two outside lines were energized and were 27.8 feet above ground. Waller explained to Schlatter that CP&L had a thirty-foot easement around the lines and that Crowvision would have to keep at least ten feet away from the outer lines.

In November 1992, Schlatter hired plaintiff to work for Crowvision as a carpenter. One of plaintiff's witnesses testified that movie-set carpenters "build the sets for the, for the movie to be shot on. . . . [A]nything you could imagine, we build, I mean, everything, anything." Plaintiff, who arrived with experience gained working on other movies, initially came to Wilmington to work on the film "Mario Brothers." While working on the set of that movie, plaintiff first began using lift equipment. Although he never received formal training, plaintiff became so proficient that he was described by his foreman as one of the best JLG operators.

In the weeks leading up to the accident, the back lot was the scene of considerable activity. Plaintiff's evidence indicated that Waller was present on the studio grounds every day, touring the back lot. In January 1993, Crowvision began work on a church and cemetery facade for "The Crow." As early as a year before the accident, the portion of the back lot where Crowvision employees worked was within ten to twelve and a half feet of energized power lines. Some of the poles on which facades would be hung "[had] been there for several years. There [had been] a set there built . . . in exactly the same location." In addition, ten or eleven new poles had been installed for "The Crow." Before the new poles were installed, Schlatter and others from Crowvision discussed with Waller the exact locations where the poles would be positioned. Plaintiff presented evidence at trial that Waller thereafter approved their installation. Although Waller later testified that he did not realize that Crowvision had encroached on CP&L's power-line easement, plaintiff's evidence established that Waller knew where the power lines were located in relation to the poles. Schlatter additionally testified that whenever Crowvision sought to make alterations to the set, he was required to meet with Waller because "[t]hat's how it was." Construction foreman Woolaston described the interaction between Crowvision and Waller regarding the placement of the new poles: "The poles were marked in their exact spots to where they were going to be, and at that point, the whole situation was gone over with myself, [Schlatter], [Waller]

**MARTISHIUS v. CAROLCO STUDIOS, INC.**

[355 N.C. 465 (2002)]

and [two other Crowvision employees]." Woolaston added that some of the poles were within one to two feet of the power lines. The remaining poles were within five to ten feet of the lines.

Crowvision employees anticipated working between these poles and the power lines, using JLGs and other lifting equipment. One witness testified that

> [t]he power lines . . . are fairly close to the, to the back side of the set. In many places, you will find yourself inbetween [sic] the set and the power lines. With the entire machine, you could be inbetween [sic] the set and the power lines . . . . The power lines are constant. Anything else out there is pretty much a movable object.

Another worker testified that

> a couple of days before the accident . . . we were putting up these walls here, and we had the JLG between this power line and the back of this wall line, and we were actually—I was at eye level. . . . And I had articulated the JLG, myself and two other people, in between the power lines and the back of the facade to get the back framing up.

Carpenter Chris Crowder explained that the reason the workers had to come close to the power lines was "because that was where the work was." Plaintiff acknowledged at trial that he was aware that the power lines were dangerous.

On 1 February 1993, Paul Saunders instructed plaintiff to assist construction foreman Woolaston on the church set. Using the access road that ran beneath the power lines, plaintiff drove a JLG along the back of the church facade. Woolaston instructed plaintiff to pick up a large, heavy door and place it into the church facade. Plaintiff accordingly drove the JLG back down the same access road to an opening in the rear of the facade, then raised the JLG boom over the facade to pick up the door. Plaintiff was in the basket at the end of the boom. Crowder, who was working near the opening in the church facade, described what happened next:

> Well, [plaintiff] boomed the lift over. He was going to pick up a door section from here, and he came over me, and I came back over to work. And I told him when he came by, I didn't think he was going to be able to reach the door from where he was. He came on through. So then I came, I came over to here, so I had

MARTISHIUS v. CAROLCO STUDIOS, INC.

[355 N.C. 465 (2002)]

my back to him. I guess he started back out, and that's when he made contact with the power lines. I had walked over to here and had my back to him when I heard the spark and explosion, and at that point, you know, we went to him.

Although the exact details are unclear because plaintiff has no memory of the event and there were no other eyewitnesses, the basket of the JLG came into contact with a power line as plaintiff maneuvered to move the door.

After hearing the explosion, Crowder saw that plaintiff was slumped over the controls and on fire. As other workers rushed to the scene, Woolaston ran to the JLG and lowered the boom. Plaintiff had collapsed in the basket. Woolaston and the others removed plaintiff from the basket and, seeing that his clothes were still burning, undressed plaintiff and wrapped him in blankets. Immediately after the accident, Waller approached the scene and told Schlatter that he had "been after Martha[1] and Dino [DeLaurentis] for years to do something about these lines."

Plaintiff was burned over forty to forty-five percent of his body. He was blinded in his right eye and suffers from a residual neurological problem of poor balance. Plaintiff's burns caused severe facial and bodily disfigurement, requiring reconstructive surgeries.

On 8 April 1994, plaintiff and his wife, Cindy, filed a complaint alleging negligence and loss of consortium against defendant, CP&L, Edward R. Pressman Film Corporation, Crowvision, and Hertz Equipment Rental Corporation. The claims against CP&L, Pressman, Crowvision, and Hertz were either settled or dismissed, and the matter proceeded to trial solely against defendant. Defendant unsuccessfully moved for a directed verdict both at the close of plaintiff's evidence and at the close of all evidence. On 16 July 1999, the jury found that plaintiff was injured by the negligence of defendant and that plaintiff was not contributorily negligent; the jury additionally found that defendant was not responsible to plaintiff's wife for loss of consortium. The jury awarded plaintiff $2,500,000. On 23 July 1999, the trial court denied defendant's motion for judgment notwithstanding the verdict or new trial and entered judgment against defendant.

Defendant appealed to the North Carolina Court of Appeals, and on 20 February 2001, a divided panel affirmed the trial court's

---

1. "Martha" is Martha Schumaker (later Martha DeLaurentis), president of Film Corporation at the time the decision was made to run CP&L's power lines overhead to the back lot.

ruling. *Martishius v. Carolco Studios, Inc.*, 142 N.C. App. 216, 542 S.E.2d 303 (2001). Defendant appeals to this Court on the basis of the dissent.

The test for determining whether a motion for directed verdict is supported by the evidence is identical to that applied when ruling on a motion for judgment notwithstanding the verdict. *Smith v. Price*, 315 N.C. 523, 340 S.E.2d 408 (1986). "In ruling on the motion, the trial court must consider the evidence in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences to be drawn therefrom and resolving all conflicts in the evidence in his favor." *Taylor v. Walker*, 320 N.C. 729, 733-34, 360 S.E.2d 796, 799 (1987). "The party moving for judgment notwithstanding the verdict, like the party seeking a directed verdict, bears a heavy burden under North Carolina law." *Id.* at 733, 360 S.E.2d at 799.

## NEGLIGENCE

**[1]** We first address whether the Court of Appeals erred in affirming the trial court's denial of defendant's motions for directed verdict and judgment notwithstanding the verdict on the issue of defendant's negligence. To prevail in a common law negligence action, a plaintiff must establish that the defendant owed the plaintiff a legal duty, that the defendant breached that duty, and that the plaintiff's injury was proximately caused by the breach. *Hunt v. N.C. Dep't. of Labor*, 348 N.C. 192, 499 S.E.2d 747 (1998). Actionable negligence occurs when a defendant owing a duty fails to exercise the degree of care that a reasonable and prudent person would exercise under similar conditions, *Hart v. Ivey*, 332 N.C. 299, 420 S.E.2d 174 (1992), or where such a defendant of ordinary prudence would have foreseen that the plaintiff's injury was probable under the circumstances, *Pittman v. Frost*, 261 N.C. 349, 134 S.E.2d 687 (1964).

This Court in *Nelson v. Freeland*, 349 N.C. 615, 507 S.E.2d 882 (1998), eliminated the distinction between invitees and licensees and established that the standard of care a landowner owes to persons entering upon his or her land is to "exercise reasonable care in the maintenance of their premises for the protection of lawful visitors." *Id.* at 632, 507 S.E.2d at 892. Adoption of a "true negligence" standard allows the jury to concentrate "upon the pertinent issue of whether the landowner acted as a reasonable person would *under the circumstances*." *Id.* (emphasis added). In addition, this Court has stated:

MARTISHIUS v. CAROLCO STUDIOS, INC.

[355 N.C. 465 (2002)]

> [T]he proprietor must use the care a reasonable man similarly situated would use to keep his premises in a condition safe for the foreseeable use by his invitee—but the standard varies from one type of establishment to another because different types of businesses and different types of activities involve different risks to the invitee and require different conditions and surroundings for their normal and proper conduct.

*Hedrick v. Tigniere*, 267 N.C. 62, 67, 147 S.E.2d 550, 554 (1966). Although *Hedrick* uses now-superseded language describing the status of the individual using the land, the principle recognizing the importance of the underlying facts in a case remains valid. As we went on to hold in *Hedrick*, in order to determine whether appropriate care has been exercised, " 'it is proper to consider the nature of the property, the uses and purposes for which the property in question is primarily intended, and the particular circumstances of the case.' " *Id.* (quoting 65 C.J.S. *Negligence* § 45(b), at 531-32 (1950)). Upon application of those factors in this case, and viewing the evidence in the light most favorable to plaintiff, we hold that plaintiff produced sufficient evidence to warrant submission of the negligence claim to the jury.

The instant case is in a somewhat atypical posture because defendant is the landowner, whereas reported cases dealing with injuries resulting from contact with a power line usually involve the supplier of electricity as the defendant. We have long held that owners of land are not insurers of their premises, *Nelson v. Freeland*, 349 N.C. at 632, 507 S.E.2d at 892; *Jones v. Southern Ry. Co.*, 199 N.C. 1, 3, 153 S.E. 637, 638 (1930), and we do not today retreat from this general rule, applicable to those such as homeowners or business proprietors who are little more than passive consumers of electric power provided by a supplier. However, in the case at bar, the evidence established that defendant was an active and knowledgeable participant with Crowvision in the planning and use of the perpetual construction site that was defendant's back lot. Defendant required in the licensing agreement that Crowvision obtain approval from defendant before making any alterations to the studio property, thereby retaining veto power over a number of Crowvision's decisions. It warranted to Crowvision that the premises were safe. Through Waller, it worked with and advised Crowvision employees on a daily basis on such routine matters as the placement of poles. Schlatter testified that production companies would have to ask Waller if they could reuse items stored in the bone yard because "they were part of the [s]tudio prop-

erty." This evidence establishes that defendant was far more than a mere landlord to Crowvision. Defendant's retention of substantial authority over the use of its property, taken together with its active involvement in Crowvision's daily routines, placed upon defendant a concomitant duty to exercise reasonable care to ensure that Crowvision's employees were not injured by coming into contact with uninsulated power lines running over the back lot.

> [O]ne who maintains a high voltage electric line at places where people may be reasonably expected to go for work, business or pleasure has the duty to guard against contact by insulating the wires or removing them to a place where human beings will not likely come in contact with them.

*Partin v. Carolina Power & Light Co.*, 40 N.C. App. 630, 632, 253 S.E.2d 605, 608, *disc. rev. denied*, 297 N.C. 611, 257 S.E.2d 219 (1979). Under the standards articulated in *Nelson* and *Hedrick*, the reasonableness of a defendant's actions depends upon the circumstances of the case, including the nature of the property involved and the intended uses of that property. Accordingly, defendant landowner had a duty to exercise such reasonable care as a landowning proprietor, running a motion-picture studio while maintaining a significant degree of control over the daily operations of its licensees, would exercise under the circumstances.

Having determined that the evidence was sufficient to hold that defendant landowner could be liable for negligence, we now turn to the question whether this and other evidence, taken in the light most favorable to plaintiff, was also sufficient to submit plaintiff's negligence claim to the jury. Evidence was presented that defendant was aware that the uninsulated power lines presented a hazard to film crews on the back lot and that workers would have to confront such a hazard to accomplish their assigned duties. Despite defendant's knowledge of the danger, it allowed near-permanent fixtures on the back lot to encroach on CP&L's easement. Although the evidence shows that the power lines were originally seventy-five feet from the place in which plaintiff was injured, defendant allowed the back lot to move closer to the lines to such a degree that various production company workers had to navigate between the back of the set and the energized lines. As described above, some portions of the set and access road became located directly under the lines.

Plaintiff presented testimony that, while a different production company was using the back lot, defendant de-energized the lines

when work reached within fifteen feet of the lines because of the hazard it presented to the crew. Additionally, defendant authorized the building of sets for "The Crow" up to the edge of the ten-foot easement, even though it knew that Crowvision employees would need to work behind the set, using lift equipment, inside the ten-foot zone. Defendant's expert witness, Raymond P. Boylston, agreed that JLGs would be used in outdoor construction settings and that workers would have to work on both sides of the set in order to attach the facades.

As noted previously, an aerial photograph of the back lot established that one year before the accident, poles extending thirty to forty feet in the air were within ten to twelve and a half feet of the power lines. Based on evidence that a JLG basket is three feet deep by five feet wide, the jury could find that even if no additional poles were installed on the set, Crowvision employees working in JLGs on the edge of the easement could be as close as five to eight feet from the lines. Moreover, through Waller, its facility manager, defendant oversaw and approved the installation of ten to eleven additional poles, including some that were located only five to ten feet from the lines and where work could be undertaken using JLGs.

Plaintiff presented expert testimony regarding both the existing condition of defendant's studio back lot and various alternatives that were available to defendant. David MacCullum was accepted as an expert in safety engineering. MacCullum's multipart opinion was that "[defendant] had a hazardous workplace because the power lines were present. No. 2 is that the power lines could have been easily removed, and third is that [plaintiff], the operator, was following the basic instructions from the JLG." MacCullum further testified that he was familiar with the customs and practices in the industry as to separation of power lines from construction activity and observed that "[t]he most reliable industry practice is to separate or remove the power lines from the workplace before the lift equipment is introduced into the work environment, so that it is now physically impossible to strike the power lines with lift equipment." He also testified:

Q: And when you say "remove the power lines," do you have an opinion as to how the power lines could have been removed from the work site?

A: Well, there [are] a number of solutions. The easiest is to bury them. The second is to barricade the area off to restrict entry into

the area. And the third: In some instances, you can provide insulation on the power lines.

The jury also heard expert testimony from Dr. Harvey Snyder that "those lines were located dangerously close to the structures which these men were working on, dangerously close when it was known that lifting-type or raising-type equipment . . . could be used in that environment." Like MacCullum, Snyder suggested de-energizing the lines, moving or burying the lines, or guarding the lines as alternatives to the current condition.

In addition, the jury was informed that defendant's property extended one hundred feet beyond the back lot. Given the evidence presented to the jury concerning the nature and use of the property, the knowledge of defendant through its facility manager of the set conditions, and the available alternatives, there was sufficient evidence to submit to the jury the question of whether defendant was negligent in causing plaintiff's injuries. The Court of Appeals did not err in affirming the trial court's denial of defendant's motions for directed verdict and judgment notwithstanding the verdict.

Defendant contends that the Court of Appeals' opinion holds it strictly liable for any injury to plaintiff caused by power lines. We have held that the mere maintenance of uninsulated power lines is not wrongful. *Mintz v. Town of Murphy*, 235 N.C. 304, 314; 69 S.E.2d 849, 857 (1952). However, liability in the case at bar is not based on the mere presence of power lines at defendant's studio. "[I]n order to hold the owner negligent, where an injury occurs, he must be shown to have omitted some precaution which he should have taken." *Philyaw v. City of Kinston*, 246 N.C. 534, 537, 98 S.E.2d 791, 794 (1957). Our holdings in *Nelson* and *Hedrick* demonstrate that a jury may consider whether, under the circumstances, defendant exercised reasonable care in the maintenance of its premises. We agree with plaintiff that there was sufficient evidence for a jury to find that the intended purpose of the property was for film-making and that film production companies utilized JLGs to lift equipment from the front and back of facades, reaching heights above the existing power lines. A jury could further find that given the nature and use of the property, as observed and authorized by defendant, workers were required to operate JLGs in close proximity to or directly under uninsulated power lines. Defendant not only knowingly allowed construction of sets up to the edge of the easement, it participated in the decision where to place poles and other parts of the set. Defendant's liability was based upon the particular facts of the case, including defendant's

awareness that Crowvision employees would be working within the power-line easement and defendant's failure to take reasonable steps to protect plaintiff. Accordingly, defendant has not been held to a strict-liability standard.

Defendant also argues that this case is controlled by our holding in *Floyd v. Nash*, 268 N.C. 547, 151 S.E.2d 1 (1966) (per curiam). In that case, a worker was preparing to discharge the contents of a feed truck into a storage tank on the defendant landowner's property. The blower pipe that the worker was using to transfer the feed contacted an uninsulated power line, and the worker was electrocuted. The decedent's estate brought suit, alleging that the defendant landowner was negligent in building the feed tank directly beneath uninsulated power lines. We determined that the evidence did not support a negligence case against the defendant landowner when "[t]he evidence show[ed] that the defendant [landowner] did not construct, determine the location of, own, control or use the feed tank." *Id.* at 551, 151 S.E.2d at 4. We further stated that the evidence supported the inference that the decedent was contributorily negligent. *Id.*

We believe *Floyd* is distinguishable. Defendant here not only knew of Crowvision's activities on its property, but also maintained a significant degree of control over Crowvision's use of the facilities under the licensing agreement. In addition, Crowvision employees testified that they had to seek approval from Waller before using props from the bone yard or erecting additional poles for facades. There was evidence that Waller was present on the studio grounds, including the back lot, every day. In light of defendant's exercise of such control over the property, the particular use to which the property was put, and defendant's knowledge of the potential dangers facing Crowvision employees from uninsulated power lines, we believe that defendant's duty of reasonable care to plaintiff included a duty to protect plaintiff from contact with an energized power line. By contrast, although the defendant landowner in *Floyd* was an electrician and had once before the accident discussed the power line with the victim, he was a mere recipient of power. The defendant landowner had no part in siting or building the feed tank, nor did he give the deceased any instructions as to how to carry out his responsibilities. Accordingly, he had no duty to the decedent regarding the uninsulated power line.

Finally, defendant alleges that there was insufficient evidence to submit to a jury that a person of ordinary prudence would have fore-

## MARTISHIUS v. CAROLCO STUDIOS, INC.

[355 N.C. 465 (2002)]

seen that plaintiff's injury was probable under the circumstances. We disagree. Our definitions of probable cause have included the requirement that the cause be "one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed." *Hairston v. Alexander Tank & Equip. Co.*, 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984). This Court has held that "[t]he test of proximate cause is whether the risk of injury, not necessarily in the precise form in which it actually occurs, is within the reasonable foresight of the defendant." *Williams v. Carolina Power & Light Co.*, 296 N.C. 400, 403, 250 S.E.2d 255, 258 (1979); *see also Davis v. Carolina Power & Light Co.*, 238 N.C. 106, 76 S.E.2d 378 (1953). Plaintiff alleged that in the ordinary course of his job on the movie set he was required to operate the JLG in close proximity to uninsulated power lines. Crowvision employees testified that it was not uncommon to have to maneuver JLG lifts between the back of the set facade and the power lines. Evidence was presented that defendant knew of these conditions. Accordingly, we hold that it was not unforeseeable as a matter of law that the type of injury plaintiff sustained would result from defendant's alleged negligence.

## CONTRIBUTORY NEGLIGENCE

[2] We next address whether the Court of Appeals erred in affirming the trial court's denial of defendant's motions for directed verdict and judgment notwithstanding the verdict on the issue of contributory negligence.

Defendant first argues that because plaintiff knew of the electrical lines, he was contributorily negligent in bringing his JLG into contact with power lines. The burden of proving contributory negligence is on defendant. *Nicholson v. American Safety Util. Corp.*, 346 N.C. 767, 774, 488 S.E.2d 240, 244 (1997). The existence of contributory negligence is ordinarily a question for the jury; such an issue is rarely appropriate for summary judgment, and only where the evidence establishes a plaintiff's negligence so clearly that no other reasonable conclusion may be reached. *Id.* While we acknowledge the general rule that a person has a legal duty to avoid open and obvious dangers, *Gibbs v. Carolina Power & Light Co.*, 268 N.C. 186, 150 S.E.2d 207 (1966), including contact with an electrical wire he or she knows to be dangerous, *Alford v. Washington*, 244 N.C. 132, 92 S.E.2d 788 (1956), "[t]hat does not mean . . . that a person is guilty of contributory negligence as a matter of law if he contacts a known electrical

wire regardless of the circumstances and regardless of any precautions he may have taken to avoid the mishap," *Williams v. Carolina Power & Light Co.*, 296 N.C. at 404, 250 S.E.2d at 258.

At trial, evidence was presented that while plaintiff was a capable JLG operator, on the day of the accident, he was operating a JLG model that used an electronic control system rather than the hydraulic system to which plaintiff was more accustomed. Kenneth Thomas Fisher, Jr., a representative from the company that rented the JLG to Crowvision, testified that the controls of this particular model of JLG were sensitive and "jerky" and stated that while operating this JLG, "[i]f you were in close proximity to an object you didn't want to strike, then yeah, you would definitely have a greater risk."

In addition, another JLG operator testified that, under some circumstances, the operator could experience difficulties seeing power lines. "Everything gets lost in the, your perspective, you know. . . . Sometimes you are closer; sometimes you are further away than you actually think you are." Woolaston described the perception as being "like if you were on a high diving board and jumping in the water, you don't know where the water is until you hit it." Woolaston further testified:

> I would have a very hard time distinguishing those power lines if they were right in here. And especially on a lift, you wouldn't see them at all. And your only vantage point, usually, looking up at them is your best view, because you are looking up against pretty much a solid sky. You get those lines while you are up on a lift, like I said, cluttered in this, in trees, or even right on the edge of that tree line where a tree line meets the sky. They look invisible. You've got to look for them. You've got to really look for them. If the sun is in your eyes, you are not going to see them at all . . . .

Plaintiff's expert MacCullum similarly testified that "[t]he power lines may be camouflaged because they blend in with the background, and it's very difficult for people to estimate accurate distances, particularly when they have multiple visual tasks to do." Although no one knew where plaintiff was looking at the time of the accident, testimony as to the relative position of the sun suggested that glare could have been a factor. Taken together, this evidence adequately raised a question sufficient to submit to the jury as to whether plaintiff was contributorily negligent.

## MARTISHIUS v. CAROLCO STUDIOS, INC.

[355 N.C. 465 (2002)]

Defendant additionally contends that plaintiff was contributorily negligent in that he chose a knowingly dangerous option when he attempted to raise the door over a facade rather than taking a different path around the side of the facade. However, evidence was presented that plaintiff had no choice but to travel down the access road underneath the lines. Schlatter, Crowvision's construction coordinator, testified that while there were other access roads on the back lot, parked vehicles and other impediments would have prevented the JLG from reaching the door by any route other than the one plaintiff took. Although defendant suggested that a forklift could have been used to move the door, plaintiff's foreman testified that the JLG was the preferable piece of equipment for the job, given the tight confines of the area and the possibility that a forklift might overturn in the uneven terrain. Finally, the jury heard the testimony of plaintiff's expert MacCullum that in his opinion plaintiff followed the basic instructions for operating the JLG.

Based on this evidence, we hold that defendant has failed to carry its burden of proving as a matter of law that plaintiff was contributorily negligent. " 'Contradictions or discrepancies in the evidence . . . must be resolved by the jury rather than the trial judge.' " *Rappaport v. Days Inn of Am., Inc.*, 296 N.C. 382, 384, 250 S.E.2d 245, 247 (1979) (quoting *Clark v. Bodycombe*, 289 N.C. 246, 251, 221 S.E.2d 506, 510 (1976)). In the case at bar, the jury properly considered and resolved the conflicting evidence to reach a verdict as to contributory negligence. Accordingly, the Court of Appeals did not err in affirming the trial court's denial of defendant's motions for directed verdict and judgment notwithstanding the verdict regarding contributory negligence.

AFFIRMED.